**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 10-CV-6266 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| REX C. STEFFES, CLIFF M. STEFFES, REX R. STEFFES, BRET W. STEFFES, ROBERT J. STEFFES, and W. GARY GRIFFITHS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are motions [29, 36] filed by Defendants W. Gary Griffiths ("Gary Griffiths") and the Steffes Family Defendants to dismiss the complaint [1] brought by the Securities Exchange Commission ("SEC") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motions to dismiss are respectfully denied.

**I.    Background**[1]

This case involves alleged insider trading in the securities of Florida East Coast Industries, Inc. ("FECI") in the period around that company's acquisition by Fortress Investment Group, LLC.  The SEC alleges that Defendants Gary Griffiths and Cliff Steffes, who were employed by an FECI subsidiary, learned of FECI's pending acquisition in the weeks before it was announced, and that they disseminated this information to members of their family (who in turn shared it among themselves and with three business associates of Defendant Rex C. Steffes). In the weeks preceding the announcement of the acquisition, Defendants Rex C. Steffes, Cliff

---

[1] For purposes of Defendants' motion, the Court assumes as true all well-pleaded allegations set forth in the complaint.  See, *e.g.*, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Unless otherwise specified, all citations in this section correspond to the SEC's complaint [1].

Steffes, Bret Steffes, Rex R. Steffes, Robert Steffes, as well as William Griffiths and the three business associates purchased more than $1.6 million of FECI securities. When the sale was announced, the investors collectively cleared more than $1 million in allegedly illegal profits.

Before its acquisition, FECI was a publicly traded company headquartered in Jacksonville, Florida. ¶ 17. FECI conducted business through two wholly-owned subsidiaries. *Id.* One subsidiary, Florida East Coast Railway, LLC ("FECR"), operated a regional freight railroad between Jacksonville and Miami. *Id.*

During the relevant time period, Griffiths and his nephew-in-law, Defendant Cliff Steffes, were employed by FECR. Griffiths was the Vice President and Chief Mechanical Officer of FECR. ¶ 11. Working out of FECR headquarters in Jacksonville, Griffiths was responsible for supervising and managing the leasing, maintenance and repair of freight cars and locomotives, and reported directly to FECR's President and Chief Operating Officer. ¶ 30. Defendant Cliff Steffes worked as a trainman at FECR's Bowden Rail Yard in Jacksonville. ¶ 13. Griffiths' sister is married to Defendant Rex C. Steffes, and Griffiths and Rex C. Steffes were high school classmates and have been good friends since the 1970s. ¶ 11. Rex C. Steffes is the father of Defendants Cliff Steffes, Bret Steffes, and Rex R. Steffes, and is the brother of Defendant Robert Steffes. Cliff Steffes obtained his position as a trainman with FECR with the help of his uncle, Griffiths. ¶ 31.

In connection with their employment, Griffiths and Cliff Steffes were both subject to FECI's Code of Conduct which prohibited them from trading in FECI securities, or recommending that others purchase FECI securities, if they had knowledge of material information about the company that had not been disclosed publicly. ¶ 32. FECI's Code of Conduct specifically provided that information regarding a merger or acquisition may constitute

material information. *Id.* Griffiths and Cliff Steffes both signed acknowledgements that they would comply with FECI's Code of Conduct. ¶ 33.

On December 4, 2006, FECI's Board of Directors engaged Morgan Stanley & Co., Inc. ("Morgan Stanley"), to sell the company. ¶ 19. That FECI was being offered for sale was confidential. ¶ 20. Between February 15 and 27, 2007, Morgan Stanley contacted a group of prospective bidders, fifteen of whom executed confidentiality agreements, received a confidential information memorandum and were given access to an electronic data room. ¶ 22. Morgan Stanley requested that the prospective bidders submit their acquisition proposals by April 12, 2007. *Id.* Between March 15 and April 3, 2007, at least ten prospective bidders attended separate meetings with FECI management in South Florida and took tours of certain FECI properties. ¶ 23. These tours occurred on most business days between March 15 and April 3, 2007.

The SEC alleges that "[b]y the end of the third week of March 2007, Gary Griffiths knew that FECI was in the process of being acquired by another company." ¶ 34. To support this allegation, the SEC alleges that Griffiths was aware of the following:

(a)     "[I]n early March 2007, FECI's Chief Financial Officer requested that Griffiths prepare a comprehensive list of all of the locomotives, freight cars, trailers and containers owned by FECR, along with their corresponding valuations." ¶ 34(a). This was the first time that the Chief Financial Officer had ever requested this information from Griffiths. *Id.*

(b)     "Gary Griffiths became aware of the unusual number of Hialeah yard tours [an FECR rail yard in Miami], which began on March 15, and he believed that the

tours were being provided to investment bankers who were considering buying or investing in FECI." ¶ 34(b).

(c)     "[S]hortly after the tours began, yard employees began asking Gary Griffiths whether FECI was being sold and whether their jobs would be affected by any such sale." ¶ 34(c).

The SEC further alleges that "[b]etween April 19 and April 27, 2007, in anticipation of FECI's pending acquisition by Fortress, Gary Griffiths arranged and monitored the rail trip from FECR's Bowden Rail Yard to the Hialeah Rail Yard for FECI and Fortress executives in a special railroad car reserved for visitors." ¶ 35. Finally, the SEC alleges that Griffiths "had daily interactions with FECR's President and Chief Operating Officer, who knew about and was involved in the entire acquisition process." ¶ 36.

The SEC makes the same allegation with regard to Defendant Cliff Steffes: that by the end of the third week of March 2007, Cliff Steffes also knew that FECI was in the process of being acquired. ¶ 37. For his part, Cliff Steffes allegedly knew by the end of the third week of March 2007 that "there were an unusual number of daytime tours of FECR's Hialeah Yard involving a tour bus and people dressed in business attire." ¶ 37(a). Shortly after these tours began, rumors began to circulate that FECR was being sold. ¶ 37(c). The SEC alleges that "there were regular communications among FECR's yard employees at various locations, and many rail yard employees who had not personally witnessed the tours became aware they were occurring." ¶ 37(b).

Additionally, Steffes worked at the Bowden Rail Yard, which was the location of a tour that occurred sometime between April 19 and 27. ¶ 38. The Bowden Rail Yard was also the departure point for the special railcar trip for FECI and Fortress executives. *Id.*

The SEC alleges that between March 28 and May 7, 2007, there developed a pattern of conversations among the Defendants (and others) followed by large securities purchases that differed significantly from Defendants' prior purchases.

For example, between March 23 and March 25, 2007, Griffiths visited Rex C. Steffes (the elder Rex Steffes), during a business trip to the Chicago area. ¶ 43. The SEC alleges that during this trip, Griffiths tipped Rex C. Steffes about the impending acquisition. On March 26, 2007, Rex C. Steffes spoke with his son Cliff on the phone. On March 28, 2007, Rex C. Steffes purchased 6,500 shares of FECI stock for $397,508. Before processing this purchase, the Steffes' broker required Rex C. Steffes and his wife to sign a document in which they acknowledged their intention to maintain a large position in FECI stock despite the broker's recommendation that they reduce the risk level of their portfolio through diversification. ¶ 44(a). On Saturday, March 31, 2007, Rex C. Steffes had a 13-minute telephone call with Griffiths. ¶ 44(b). The next business day, Rex C. Steffes purchased another 7,500 shares of FECI stock for $485,350. Rex C. Steffes' pattern of making relatively large purchases of stock and call option contracts shortly after speaking with Gary Griffiths and/or Cliff Steffes continued until the end of April. See ¶¶ 44(a)-(g). In total, during a 33 day period, Rex C. Steffes purchased 15,800 shares of FECI stock and 225 FECI call options for a total investment of approximately $1.14 million. ¶ 45. All of the call options were set to expire in June 2007. ¶ 45.

With respect to Robert Steffes (Rex C.'s brother), the SEC describes a similar pattern. Between April 2 and April 18, 2007, Robert Steffes purchased 5,000 shares of FECI stock for a total of $319,569. ¶¶ 49-50. Each of Robert Steffes' purchases was made shortly after a phone call between Rex C.'s and Robert's cell phones. *Id.*

On three different occasions in April and May 2007, Cliff Steffes purchased FECI call option contracts totaling $15,015 set to expire in June 2007. ¶ 39. These were the first stock option contracts that Cliff Steffes had ever purchased. ¶ 40. The SEC alleges that Cliff Steffes tipped his brothers, Bret and Rex R. Steffes. ¶ 55. Between March 29 and May 1, 2007, Bret Steffes purchased 60 shares of FECI stock and 112 FECI call options for a total investment of $30,775. ¶ 56. During this same period, Rex R. invested $31,018 in FECI securities. ¶ 58. Each of the brothers' purchases was made in temporal proximity to cell phone calls with Cliff. Bret and Rex R. were each provided with $10,000 from their father Rex C. to be used to purchase FECI securities; they each applied those monies towards their purchases. ¶ 55(c). The SEC alleges that each of Defendants' purchases was atypical of their trading histories. For instance, Bret and Rex R's purchases represented more than their 2006 annual incomes and nearly all of their liquid net worth. ¶¶ 60; 61.[2]

By April 13, 2007, FECI had received nine separate acquisition proposals. ¶ 24. On May 6, 2007, Fortress submitted a definitive offer to purchase FECI for $3.5 billion for a payment of $84 per share, including the payment of a $21.50 special dividend. ¶ 28. FECI's board accepted Fortress's offer the next day. ¶ 28. FECI announced its agreement with Fortress on May 8, 2007 prior to the commencement of trading on the New York Stock Exchange. ¶ 29. That day, FECI's stock price closed at $84.91 per share, a 14.5% increase from the previous closing price of $74.13. *Id.*

---

[2] The SEC also alleges that three business associates of Rex C. Steffes purchased FECI securities based upon information provided by him. See ¶¶ 53-54. The SEC further alleges that Bret and Rex R. tipped their grandfather, William Griffiths, to the pending acquisition of FECI, and William Griffiths purchased FECI securities based on that information. ¶ 63. Specifically, in January 2007, William Griffiths owned 300 shares of FECI stock. ¶ 63(a). He sold that stock for $17,379 on March 20, 2007 because he believed that the stock was declining in price. *Id.* However, after a visit to the home of Bret and Rex R. Steffes, William Griffiths changed his mind, and on April 2, 2007, repurchased 300 shares for $18,885. William Griffiths is now deceased.

Cliff Steffes sold all of his FECI call option contracts on May 8, 2007, realizing $51,935 in profits, a 346% gain. ¶ 42. Rex C. Steffes sold all of his FECI stock and call options on May 8, 2007, realizing $618,376 in profits, a 36% gain in one month. ¶ 48. Robert Steffes sold his securities on May 9, 2007 realizing $101,481 in profits, a gain of 32%. ¶ 52. Bret and Rex R. Steffes each experienced gains of over 300% after selling their FECI securities on May 8, 2007.[3]

The SEC's one-count complaint alleges that Defendants Gary Griffiths, Rex C. Steffes, Cliff Steffes, Rex R. Steffes, Bret Steffes and Robert Steffes violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The SEC seeks a permanent injunction against all Defendants from future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The SEC further requests that Defendants be ordered to disgorge their profits from the alleged insider trades and that they pay civil penalties pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

## II.     Legal Standard

Defendants move to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint, not its merits. See, *e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be

---

[3] Rex C. Steffes' business associates each gained more modest profits upon selling their securities on May 8, 2007.

sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 550 U.S. at 563. In other words, the pleading must allege facts that plausibly suggest the claim asserted. *Twombly*, 550 U.S. at 570. "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). As noted above, the Court accepts as true all well-pleaded facts alleged by Plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Allegations of securities fraud under § 10(b) and Rule 10b-5 fall under the pleading requirements of general fraud and must satisfy the heightened pleading requirements of Rule 9(b). See Fed. R. Civ. P. 9(b); *SEC v. Kelly*, 545 F. Supp. 2d 808, 811 (N.D. Ill. 2008) ("[U]nder Rule 9(b), allegations of securities fraud are subject to heightened pleading requirements."); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004) (A claim that 'sounds in fraud'-in other words, one that is premised upon a course of fraudulent conduct-can implicate Rule 9(b)'s heightened pleading requirements.")); *SEC v. Espuelas*, 698 F. Supp. 2d 415, 424 (S.D.N.Y. 2010) ("securities complaints brought by the SEC are subject to the heightened pleading standards imposed by Rule 9(b) to the extent that they make allegations sounding in fraud") (internal quotation omitted).

Rule 9(b) states that for "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake" Fed. R. Civ. P. 9(b), whereas "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*[4] A complaint satisfies Rule 9(b) when it alleges "the who, what, when, where, and how: the first paragraph of a newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The stringent pleading requirement under Rule 9(b) serves three main purposes: "'to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them.'" *SEC v. Buntrock*, 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004) (quoting *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 819 (N.D. Ill. 2000)).

## III.    Analysis

Section 10(b) makes it "unlawful for any person * * * [t]o use or employ, in connection with the purchase or sale of any security * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe * * *." 15 U.S.C. § 78j(b). As promulgated by the SEC, Rule 10b-5 makes it unlawful for any person:

>    (a)    To employ any device, scheme or artifice to defraud,
>
>    (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or
>
>    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Trading on the basis of material, non-public information violates these sections when the trading occurs in connection with the breach of a fiduciary duty. *Dirks v. SEC*, 463 U.S. 646,

---

[4] Rule 9(b) was amended effective December 1, 2007, but the Advisory Committee Notes to the Federal Rules explain that the 2007 amendment was "intended to be stylistic only."

663 (1983); see also *Chiarella v. United States*, 445 U.S. 222, 232-36 (1980); *SEC v. Cherif*, 933 F.2d 403, 410 (7th Cir. 1991). A person is liable for insider trading when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose, and then (c) misappropriates or otherwise misuses that information (d) with *scienter*, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." *Dirks*, 463 U.S. at 654; *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981).

There are two theories under which a breach of fiduciary duty can be established such that a violation of Rule 10b-5 arises: (1) classical theory, and (2) misappropriation theory. *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). "'Under the classical theory, a person violates [Rule 10b-5] when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded.'" *Id.* (quoting *Cherif*, 933 F.2d at 409).

The misappropriation theory "extends the reach of Rule 10b–5 to outsiders who would not ordinarily be deemed fiduciaries of the corporate entities in whose stock they trade." *Cherif*, 933 F.2d at 409. Under the misappropriation theory, a corporate "outsider" and his tippees can be held liable for the misappropriation of material, non-public information from its lawful possessor. *Maio*, 51 F.3d at 630; see also *SEC v. Michel*, 521 F. Supp. 2d 795, 822 (N.D. Ill. 2007). When an outsider misappropriates confidential information from his source of the information, he is considered to be breaching a fiduciary duty owed to the source in violation of Rule 10b–5. *Id.* For an individual to be held liable under a misappropriation theory, the SEC must plead and prove (1) the misappropriation of material, non-public information; (2) in breach of a fiduciary duty; (3) in connection with the purchase or sale of securities; and (4) the requisite *scienter*. *Michel*, 521 F. Supp. 2d at 822-23 (citing *Maio*, 51 F.3d at 631). "Tipper liability (and

the tippee liability derived from it), the Supreme Court noted in *United States v. O'Hagan*, 521 U.S. 642 (1997), is a species of the 'misappropriation' theory of liability." *U.S. v. Evans*, 486 F.3d 315, 322 (7th Cir. 2007). "Trades by tippees are attributed to the tipper." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980).

In his motion [29], Defendant Griffiths argues that the complaint fails to satisfy the pleading requirements of Rule 8(a)(2) because it fails to set forth sufficient facts to plausibly show that Griffiths (i) knew of material nonpublic information; (ii) misappropriated material non-public information; (iii) breached his fiduciary duty to FECI; and/or (iv) possessed the requisite *scienter*. *Id.* at 6. Defendant Griffiths' motion also argues that the complaint fails to satisfy the heightened pleading requirements of Rule 9(b) by "failing to identify Griffiths' particular role in the purported scheme, and instead attempting to hold Griffiths responsible for the conduct of other defendants." *Id.* at 13.

In addition to adopting the arguments made in Defendant Griffiths' memorandum,[5] in their memorandum [37], the Steffes Defendants argue that the complaint (1) fails to properly allege that the Steffes Defendants possessed material nonpublic information; (2) fails to describe a plausible breach of fiduciary duty; and (3) fails to plead with the requisite particularity that the Steffes Defendants acted with *scienter*. The Steffes' motion "focus[es] primarily on Section C of the SEC's Complaint, entitled 'Gary Griffiths and Cliff Steffes Learned About the Pending Acquisition of FECI.'" Steffes Mem. [37] at 1.

After carefully considering the complaint, the parties' memoranda, and the relevant legal authorities, the Court concludes that the SEC's complaint sufficiently pleads a cause of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for insider trading.

---

[5] The Steffes Defendants specifically adopt the arguments of Defendant Gary Griffith's Motion to Dismiss. See [37 at 1 n.1].

## A. Possession of Material, Non-Public Information

The SEC's complaint is based on its allegation that "[b]y the third week of March, 2007, both Gary Griffiths and Cliff Steffes knew that FECI was in the process of being acquired by another company," and the "fact that the company was for sale constituted material nonpublic information." Cmplt. at ¶ 2. Both motions to dismiss challenge this "conclusory" allegation as not pled with sufficient particularity to satisfy Rule 9(b), or even supported with sufficient facts such as to satisfy the plausibility requirement of Rule 8(a).

With respect to Defendant Griffiths, the SEC's allegation that Griffiths knew of the impending sale of FECI satisfies both Rule 8(a) and Rule 9(b). Unlike the typical insider trading case, Griffiths is not alleged to have been part of the confidential merger negotiations, or even directly informed of their existence.[6] Instead, Griffiths is alleged to have pieced together for himself what was occurring based on information that was available to him as an FECR employee. This is a cognizable theory: it is well established that a defendant can be held liable for insider trading when he or she obtains and acts on pieces of information, which, "piece[d] together," constitute material nonpublic information. See, *e.g. United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) (upholding criminal conviction for insider trading when the defendant "was never told about the acquisition and did no more than piece together evidence obtained while working for" the acquirer); *SEC v. Binette*, 679 F. Supp. 2d 153, 159 (D. Mass 2010) (citing *SEC v. Materia*, 745 F.2d 197, 199 (2d Cir. 1984) ("A defendant may be liable under the misappropriation theory when he pieces together incomplete fragments of confidential information provided through his employment to identify likely acquisition targets and then trades stock in those target companies.")); see also *SEC v. Materia*, 745 F.2d 197, 199 & n.2 (2d

---

[6] To be sure, the complaint alleges that Griffiths reported directly to FECR's President and COO and had some interaction with the CFO around the time of the merger.

Cir. 1984); *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 854 (2d Cir. 1981).[7]

Here, the SEC identifies what material non-public information Griffiths is alleged to have possessed (the knowledge that FECI was in the process of being sold), when he possessed this information (by the end of the third week of March 2007), and how he obtained sufficient underlying facts to reach that conclusion. Specifically, in "early March 2007," Griffiths' boss, FECR's CFO, asked him to compile a list of FECR's assets and their corresponding valuations. ¶ 34(a). This was the first time that this sort of information had been requested from Griffiths. *Id.* Drawing all reasonable inferences in Plaintiff's favor, this request could have triggered the realization that a potential merger was afoot.[8] Before the third week of March 2007, Griffiths' suspicion that the company was in the process of being acquired was bolstered by somehow learning (it is not disclosed how) of an "unusual number of Hialeah yard tours," which began on March 15. Cmplt. at ¶ 34(b). The SEC also alleges that rumors of an impending sale cemented Griffiths' conclusion. ¶ 34(c).

It is not obvious that a person who was asked to compile a list of assets, somehow became aware of yard tours occurring 300 miles away, and heard rumors that the company would be sold would come to the ultimate conclusion that FECI was in fact being sold. However, the SEC has certainly given Griffiths "fair notice" of its claim and "the grounds upon

---

[7] In their Reply brief, the Steffes Defendants accuse the SEC of attempting to "amend the complaint" through its response brief. Steffes Reply at 4-6. Specifically, the Steffes argue that while the response argued a "piecing together" theory to explain how Defendants obtained material non-public information, the "Complaint contains no such 'piecing together' allegations." *Id.* The Court respectfully disagrees. The SEC has not added any new facts; its "piecing together" argument is an application of relevant cases to the facts alleged in its complaint. The SEC was not required to plead any specific legal theory in its complaint. See *Alioto v. Town of Lisbon*, 2011 WL 2642369, at *5 (7th Cir. July 7, 2011) ("we have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.") (collecting cases).

[8] Griffiths argues that "the request that Griffiths create a list of all rolling stock (locomotives, freight cars, etc.) is equally or more consistent with a purchase of insurance as it is an acquisition." Griffiths Reply at 6. Maybe so, but at this stage of the litigation, the Court must draw all reasonable inferences in the plaintiff's favor. *E.g. Barnes*, 420 F.3d at 677.

which it rests." *Twombly*, 550 U.S. at 555. And the facts that the SEC has alleged to substantiate its allegation that Griffiths knew by the end of the third week of March, 2007 that FECI was in the process of being sold are enough to render that allegation "plausible on its face." *Id.* at 570; see also *Iqbal*, 129 S.Ct. at 1949 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").[9]

A number of additional considerations bolster the Court's conclusion that the SEC's allegation that Griffiths knew that FECI was up for sale is adequately pled. First, while the SEC has not pled facts that *directly* show that Griffiths knew in advance that FECI was up for sale, the SEC will *never* have to provide direct evidence of Griffiths' possession of material non-public information. Ultimately, the SEC may try to prove its insider trading claim through circumstantial evidence. See *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983); see also *SEC v. Horn*, 2010 WL 5370988, at *4 (N.D. Ill. Dec. 16, 2010) ("Direct evidence of insider trading is, indeed, rare; and the SEC is entitled to prove its case through circumstantial evidence."); *SEC v. Van Wagner*, 1999 WL 691836, at *3-4 (N.D. Ill. Aug. 25, 1999) ("[C]ircumstantial evidence is sufficient to prove insider trading without a direct confession from either the tippee or tipper.").

Second, in addition to the supporting allegations found in paragraph 34 (a) – (c), other portions of the SEC's complaint lend plausibility to the allegation that Griffiths possessed material non-public information before the family began trading. The SEC's complaint alleges

---

[9] The Court need not rely on the allegation that Griffiths arranged and monitored a special rail trip for Fortress and FECR executives. See Cmplt. at ¶ 35. The rail trip is alleged to have been arranged and completed some point "between April 19 and April 27, 2007," which is long after the Steffes Defendants began trading. While this allegation may lend additional plausibility to the SEC's allegation that Griffiths possessed material non-public information in the later part of April, it has no bearing on the their allegation that Griffiths knew that FECI would be sold by the end of the third week of March.

that Griffiths' job put him in close proximity with FECI's President, Chief Operating Officer, and Chief Operating Officer, all of whom had knowledge of the sale. This too lends plausibility to the allegation that Griffiths might have learned of the sale by the third week of March. *SEC v. Suman*, 684 F. Supp. 2d. 378, 388 (S.D.N.Y. 2010) ("Although the SEC cannot isolate the moment when [the defendant] became aware of the contemplated tender offer, he had many opportunities to acquire such knowledge."); see also *SEC v. Van Wagner,* 1999 WL 691836, at *3–4 (N.D. Ill. Aug.25, 1999).

Third, the Court could not expect the SEC to allege *precisely* when and how Griffiths concluded that FECI was up for sale—only Griffiths would have those details. See *SEC v. Scoppetoulo*, 2011 WL 294443, at *3 (S.D. Fla. Jan. 27, 2011) (rejecting argument that insider trading allegation not properly pled under Rule 9(b), reasoning that "[a]llthough the SEC has not provided the precise words in the communications, the SEC's allegations, taken together with the Defendants' highly suspicious pattern of access to confidential information and subsequent stock purchases, is sufficient to survive Defendants' Rule 9(b) challenge."); *Energy Factors, Inc. v. Nuevo Energy Co.*, 1991 WL 259425, at *4 (S.D.N.Y. Nov. 22, 1991) ("In cases involving insider trading, however, where the specific facts are 'peculiarly within the knowledge of defendants,' the application of Rule 9(b) is 'relaxed' to allow circumstantial evidence to plead the specific content and circumstances of insider tips."). In related fashion, at this early stage of the case, the Court can draw the inference that Griffiths believed that he had information that the market did not from the fact that close members of Griffiths' family invested a large portion of their collective liquid net worth in FECI stock after speaking with him. See *Suman*, 684 F. Supp. 2d. at, 388 (allegation that defendant "*possessed* material non-public information" was

"confirmed by [his] unusual timing and volume of trading") (emphasis in original)).[10]

In sum, as to Griffiths, the Court concludes that although the SEC's allegations are not robust, and that development of the facts through discovery may cast doubt on whether the information available to Griffiths truly was "material," "non-public," and intended to be available only for a corporate purpose, the allegations are sufficient to survive a motion to dismiss.

The analysis is similar for Defendant Cliff Steffes. The SEC alleges that Cliff Steffes (like his uncle) knew that FECI was in the process of being sold by the end of the third week of March 2007. While the underlying facts that lend plausibility to this allegation are admittedly thinner for Cliff Steffes than they are for Griffiths, they are sufficient to support a claim for insider trading at the pleading stage. Cliff Steffes allegedly knew "[b]y the end of the third week of March, 2007" that "there were an unusual number of daytime tours of FECR's Hialeah Yard involving a tour bus and people dressed in business attire." ¶ 37(a). We are not told specifically *who* told Cliff Steffes this, or how he otherwise learned it apart from the allegation that "there were regular communications among FECR's yard employees at various locations, and many rail yard employees who had not personally witnessed the tours became aware they were occurring." ¶ 37(b). Further, shortly after these tours began, rumors began to circulate that FECR was being sold. ¶ 37(c). When these allegations are considered in light of Cliff Steffes' own trading in

---

[10] Griffiths further argues that the complaint "fails to identify Griffiths' particular role in the purported scheme, and instead attempts to hold Griffiths responsible for the conduct of other defendants" in violation of Rule 9(b). Griffiths Mem. at 13 (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992) and *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). The Court disagrees. The allegations particularly describe what information Griffiths had, with whom he spoke, and when each conversation allegedly took place. Griffiths cites paragraph 44 in the complaint as an instance of "group pleading," because it attributes conduct to "Gary Griffiths and Cliff Steffes" together. However, subparagraphs (a) through (g) of that very paragraph precisely identify what conduct is attributed to Cliff Steffes and what conduct is attributed to Griffiths.

company stock and the investments made by members of his close family, they are sufficient to lend the requisite plausibility to the SEC's ultimate allegation of Cliff Steffes' possession of material nonpublic information. Again, as with Griffiths, discovery may undermine the SEC's theory as pled, but the pleading is adequate to clear the bar at this initial stage.

The motions to dismiss also argue that any facts that Griffiths and Cliff Steffes knew did not constitute "material" information. See, *e.g.* Griffiths Mem. at 8. Information is "material" in the § 10(b) and Rule 10b-5 context if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Defendants argue that the information allegedly possessed by Griffiths and Cliff Steffes—such as the fact that visitors were touring rail yards and taking trips in railway cars—"cannot reasonably be considered 'material' in the context of securities trading." Griffiths Mem. at 8. But as discussed above, the SEC does not contend that each of these underlying facts on its own is a material non-public fact. Rather, the SEC alleges that Defendants' trades were based on the ultimate conclusion—deduced from the totality of the information available to Griffiths and Cliff Steffes—that FECI was in the process of being sold before the sale was announced.

As an initial matter, courts frequently have observed that questions of materiality are ill-suited to resolution of a motion to dismiss. See *Levinson*, 485 U.S. at 239 ("Whether merger discussions in any particular case are material therefore depends on the facts."); *SEC v. Kornman*, 391 F. Supp. 2d 477, 485 n.2 (N.D. Tex. 2005) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("the question of materiality cannot be resolved on a motion to dismiss unless the facts are 'so obviously unimportant to a reasonable investor that reasonable

minds could not differ on the question of their importance.'").  Again, the allegations are by no means overwhelming.  That said, if the SEC can substantiate its allegation that Defendants actually did know of FECI's impending sale, they may well be able to establish the materiality of this information.  See *Roszak*, 495 F. Supp. 2d at 888 ("Information about a potential merger, including information that meetings are occurring relative to a potential merger, is often considered material."); *Michel*, 521 F. Supp. 2d at 825 ("[f]ew matters are considered more material than a corporation's involvement in a possible merger or acquisition.").  Further, the SEC's allegations that Defendants possessed material non-public information are rendered more plausible by the great aplomb with which Defendants are alleged to have acted on the information once they received it.  See *SEC v. Binette*, 679 F. Supp. 2d 153, 156 (D. Mass. 2006) ("it is apparent from [the defendant's] subsequent actions that he believed the information to be sufficiently material); *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968) ("a major factor in determining whether [non-public information is material] is the importance attached * * * by those who knew about it."); *Scoppetoulo*, 2011 WL 294443, at *3 ("the pattern of phone calls and text messages and subsequent stock purchases also indicates the information was material. * * * [Defendants] purchased * * * stock immediately following each of the alleged tips * * *.  Taken together, these allegations sufficiently plead the material and nonpublic nature of the alleged disclosed information.").

## B.  Misappropriation

Next, Defendant Griffiths argues that "the complaint fails to allege how and when Griffiths engaged in misappropriation or what he purportedly misappropriated."  Griffiths Mem. at 9.  Griffiths argues that the "only factual allegations in the Complaint relating to Griffiths' purported misappropriation are brief references to telephone calls between Griffiths and Rex C.

Steffes. The allegations state the date of each call and what telephones were used, but do not identify the inside information, if any, allegedly exchanged during these calls." *Id.*

The Court agrees with Griffiths' assertion that "[m]ere telephone calls between family members, without more, do not plausibly support a conclusion that Griffiths misappropriated inside information." *Id.* However, the SEC's complaint contains more than just the fact that phone calls occurred—Griffiths overlooks the allegations that Rex C. Steffes engaged in suspicious trading shortly after his calls with Griffiths. Evidence of phone calls followed by such trading is sufficient to support a reasonable inference that Griffiths tipped Steffes in each of the phone calls that preceded the suspicious trades. See, *e.g. SEC v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information. The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information"); *Michel*, 521 F. Supp. at 824 (citing *U.S. v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) (evidence of a "sequence of communications in close proximity to each other" followed "almost immediately by the unusually large purchases of [company] stock by every person involved * * * creates a compelling inference that insider trading occurred"); *SEC v. Warde*, 151 F.3d 42, 47–48 (2d Cir. 1998) (defendant's access to insider information, coupled with pattern of phone calls and stock purchases, provided sufficient evidence of insider trading to support jury verdict).

It is true that the SEC does not (and cannot) allege the specific content of the conversations between Griffiths and his brother-in-law Rex C. Steffes—those conversations were not wiretapped. But because that information is "peculiarly within the knowledge of

defendants," the SEC need not "plead the specific content and circumstances of [the] insider tips." *Aragon Capital Mgmt., LLC*, 2008 WL 216320, at *3 (S.D.N.Y. 2008).[11]  Perhaps there is another explanation for the calls; much more will be known after discovery.

### C.    Breach of Fiduciary Duty

Griffiths and Cliff Steffes do not deny that as employees of FECR, they each owed a fiduciary duty to their company.  Griffiths and Cliff Steffes also do not dispute that they each signed FECI's Code of Conduct, which prohibited disclosing material nonpublic information to outsiders.  But both Defendants argue that the SEC has not plausibly alleged that they breached the fiduciary duty that they owed.  The Court respectfully disagrees.

Griffiths argues that the complaint "fails to allege the way in which Griffiths may have benefitted directly or indirectly from the disclosure."  Griffiths Mem. at 11.  Griffiths himself did not trade in FECI stock.  And Griffiths points out that the complaint does not specifically allege that Griffiths *knew* that his family members would trade on the information that he provided.  *Id.*

Nevertheless, the complaint adequately alleges a breach of fiduciary duty by Griffiths.  It is well established that an insider who provides material nonpublic information to another may be found liable for insider trading, even if he or she did not personally buy or sell securities.  See, *e.g. Alexander*, 160 F. Supp. 2d 624, 650 (S.D.N.Y.) ("[A] person who is in possession of inside information and discloses that information to others can be held liable for violating section 10(b) and Rule 10b-5 as as a 'tipper' even if he or she did not trade on the inside information.").  In *Dirks*, the Supreme Court explained that "the test is whether the *insider* personally will benefit, directly or indirectly, from his disclosure."  463 U.S. at 662 (emphasis added).  While

---

[11] Additionally, Griffiths focuses on the allegation concerning his supervision of the visitor rail trip that occurred between April 19 and 27 and argues that it would be "impossible for Griffiths to convey inside information he was not yet alleged to possess," (Griffiths Mem. at 10), when he spoke to his brother-in-law in late March.  But this argument ignores the well-pled allegation that Griffiths had inside information "[b]y the third week of March 2007."  Cmplt. at ¶ 37.

recognizing that the insider must seek to benefit from disclosing inside information, the Supreme Court noted that "[t]here are objective facts and circumstances that often justify [the] inference" that the insider benefitted from the disclosure. *Id.* at 664. For example, "[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider *makes a gift of confidential information to a trading relative or friend." Id.* (emphasis added); see also *United States v. Evans*, 486 F.3d 315, 321 (7th Cir. 2007) (quoting *Dirks*) ("the concept of gain is a broad one, which can include a 'gift of confidential information to a trading relative or friend.'").

The SEC has alleged that Griffiths' tips to Rex C. Steffes, his wife's brother, induced Steffes to trade and resulted in significant profits. Accordingly, it is reasonable to conclude that Griffiths received a personal benefit from making those tips, and the SEC was not required to plead that Griffiths received any direct financial benefit from tipping Steffes. See *SEC v. Sekhri*, 2002 WL 31654969, at *2 (S.D.N.Y. Nov. 22, 2002) ("Thus, when Sekhri disclosed insider information to his father-in-law, Sehgal, it may be inferred that Sekhri received some personal benefit from the gift of information."); see also *SEC v. Kueng*, 2010 WL 3026618, at *4 (S.D.N.Y. 2010). Further, it is a reasonable inference from the allegations in the complaint that Griffiths either knew or should have known that Rex C. Steffes would trade on the information that Griffiths had provided. See Griffiths Mem. at 11. The complaint also properly alleges a breach with respect to the tippee Defendants. See generally *Maio*, 51 F.3d at 632-33 (finding tippee knew or should have known of tipper's breach when he engaged in pattern of buying the corporation's stock after each phone call with the tipper).

For his part, Cliff Steffes' argues that the SEC has not alleged a plausible breach of fiduciary duty because none of the information allegedly possessed by Steffes was confidential

corporate information that could not be shared with outsiders. Steffes Mem. at 13 (citing *Maio*, 51 F.3d at 632 ("Whether an insider's disclosure breaches his fiduciary duty to his corporation, and is therefore improper, depends largely upon the purpose for the disclosure. An insider's disclosure is improper when corporate information, intended to be available only for corporate purposes, is used for personal advantage."). Cliff Steffes argues that the information alleged to be in his possession (such as rumors about employees losing their jobs and knowledge of yard tours by men in business suits) cannot be characterized as confidential corporate information. This argument is essentially duplicative of other arguments challenging the "materiality" of the information allegedly possessed by Griffiths and Cliff Steffes, which the Court rejected above. The material nonpublic information at issue is not only the fact of yard tours having occurred and the rumors among employees, but the knowledge that the company was being offered for sale. See Cmplt. at ¶ ("The fact that the company was for sale constituted material nonpublic information."). The SEC has adequately alleged that the fact of the sale was confidential, see *id.* at ¶¶ 2; 20; 22, and that the report assigned to Griffiths, the tours, and the special rail trip were themselves pieces of confidential information, in that they were all part of FECI's acquisition process, that Griffiths and Cliff Steffes only learned through their jobs. *Id.* at ¶¶ 22-27; 34-36.

Accepting the SEC's allegations as true, Defendants signed codes of conduct, vowing to preserve the confidentiality of information learned during their employment and uphold their fiduciary duties to FECI shareholders. Through their jobs, Defendants allegedly gained an informational advantage over other shareholders and used it to their benefit when they traded and tipped.

**D.** *Scienter*

Finally, Defendants argue that the complaint fails to plausibly allege that Defendants

acted with the required *scienter*, which is an intent to deceive, manipulate or defraud.  *Aaron v. SEC*, 446 U.S. 680, 695–98 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976).

Before the Court can consider this argument, it must resolve a dispute about what pleading standard the SEC must satisfy when pleading *scienter*.  The Steffes Defendants argue that there is "a split of authority about whether a heightened pleading standard exists for allegations of knowledge in SEC enforcement actions" and invite the Court to adopt a rule whereby the SEC must plead facts giving rise to a "strong inference" that Defendants acted with the required state of mind.  Steffes Mem. at 7.  The Court respectfully declines the Steffes' invitation.

The Steffes' argument is based on the requirement under the Private Securities Litigation Reform Act ("PSLRA"), whereby certain private plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  See 15 U.S.C. § 78u–4(b)(2).  In support of their argument that the strong-inference-of-*scienter* standard should apply not just to claims subject to the PSLRA, but also to SEC enforcement actions, the Steffes cite three cases from the District of Massachusetts (all decided by the same judge) which use "strong inference" language in the context of analyzing complaints in SEC enforcement actions.  See *SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D. Mass. 2007); *SEC v. Tambone*, 417 F. Supp. 2d 127, 130-31 (D. Mass. 2006), and *SEC v. Druffner*, 353 F. Supp. 2d 141, 149-50 (D. Mass. 2005).  Citing those same three cases, the defendant in *SEC v. Patel*, a case from the District of New Hampshire, made the same argument that the Steffes Defendants advance here.  See 2008 WL 781914, at *5 (D. N.H. March 24, 2008).  The judge in *Patel* analyzed the three Massachusetts cases and concluded that "[t]hose opinions cannot support the weight [that the defendant] places on them."  *Id.* ("The court in *Tambone* rejected the SEC's argument that it

should relax the Rule 9(b) particularity requirement, but said nothing about the pleading standard for *scienter*. Moreover, while both *Durgarian* and *Druffner* appear to have applied the strong-inference standard in SEC enforcement actions, it does not appear that in either case the question of the pleading standard for *scienter* was actually contested. Of course, it is difficult to know for certain, but neither decision distinguished or even cited the rather large number of cases holding that the strong-inference standard does not apply to SEC enforcement actions, which suggests that the issue was not presented to the court.") (internal citations omitted). The Court agrees with the analysis from *Patel*.

Many "cases from across the country * * * stand for the proposition that the 'strong-inference' standard applies only to private securities actions," not enforcement actions such as this. *Patel*, 2008 WL 781914, at *5 (collecting cases); see *e.g. SEC v. Falor*, 2010 WL 3385510, at *3 n.4 (N.D. Ill. Aug. 19, 2010) (citing 15 U.S.C.A. § 78u–4(b)(2) ("As a government entity, the SEC is not subject to the more stringent pleading standards imposed by PSLRA.")); *SEC v. Lucent Techs., Inc.*, 363 F.Supp.2d 708, 717 (D.N.J. 2005) ("[T]he case law supports the conclusion, that the heightened requirements for pleading *scienter* under the PSLRA do not apply to actions brought by the SEC."). The Steffes Defendants candidly recognize in their memorandum that the weight of pertinent decisions (including cases from this district) decline to impose the PSLRA's heightened pleading requirements on the SEC. See Steffes Mem. at 7-8. Further, and perhaps most importantly, when the *Tambone* decision reached the First Circuit on appeal, that court "decline[d] to apply the 'strong inference' requirement of the PSLRA" to the SEC enforcement action before it. *SEC v. Tambone*, 550 F.3d 106, 119 (1st Cir. 2008), superseded in part on other grounds by 597 F.3d 436.[12] In their reply brief, the Steffes

---

[12] See also *id.* ("Here, however, we are evaluating a securities complaint filed by the SEC, not a private actor. Therefore, on its face, the requirements of the PSLRA do not apply. Additionally, the rationales we

Defendants clarify that the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) is the source of a "heightened standard * * * [to be applied] to SEC enforcement actions," not the text of the PSLRA itself. Steffes Reply at 17. This argument too fails, as *Tellabs* specifically concerned the pleading standard to be applied to private plaintiffs subject to the PSLRA. See *Tellabs*, *passim*. Nowhere in the *Tellabs* decision did the Court discuss SEC enforcement actions.[13]

While Rule 9(b) states that mental states "may be alleged generally," there must still be "some basis for believing the plaintiff could prove *scienter*." *Mason v. Medline Industries, Inc.*, 731 F. Supp. 2d 730, 740 (N.D. Ill. 2010); see also *Triteq Lock & Sec. LLC v. HMC Holdings LLC*, 2011 WL 2648592, at *4 (N.D. Ill. July 5, 2011) ("Although knowledge and intent may be pled generally, the pleadings must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.") (internal citation omitted). The complaint meets this standard.

The complaint alleges that Defendants each "acted with *scienter* by trading and/or disclosing confidential information regarding FECI's pending acquisition when they either knew, or were reckless in not knowing, that they were doing so in breach of a duty not to trade on that information or disclose that information to others." Cmplt. at ¶ 71; see also *id.* at ¶¶ 65-69. While the above-cited *scienter* allegations are conclusory, those allegations are adequately

---

set forth for a more demanding standard in private securities actions do not apply to this SEC enforcement action. Whereas private parties have a financial incentive to initiate 'strike' suits and drag deep-pocketed defendants into court on allegations of fraud in hopes of obtaining a lucrative settlement, the SEC's statutory task is to protect the investing public by policing the securities markets and preventing fraud.").

[13] That is not to say that *Tellabs* has no bearing on the applicable standard. For example, in accordance with the instruction in *Tellabs*, the Court has considered the "complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively" meet the *scienter* standard. *Tellabs*, 551 U.S. at 322-23; see also *Tambone*, 550 F.3d at 120 (declining to apply the "strong inference" requirement of the PSLRA to SEC enforcement action, but adopting Supreme Court's instruction to consider complaint in its entirety when analyzing *scienter* allegations).

supported by other facts alleged in the complaint. In an insider trading case, the Court may infer *scienter* from the circumstantial evidence. *Herman & MacLean,* 459 U.S. at 391 n.30; *Michaels v. Michaels,* 767 F.2d 1185, 1199 (7th Cir. 1985). Here, for example, the complaint alleges that Defendants' trades were extremely unusual for their trading histories. See, *e.g. SEC v. Adler*, 137 F.3d 1325, 1340-41 (11th Cir. 1998) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter."). Further, the suspicious timing between phone conversations between insiders and Defendants' trades in FECI stock also supports an inference of *scienter*. See, *e.g. Alexander*, 160 F. Supp. 2d at 652-53 (holding that the "timing of the alleged contacts" combined with the "subsequent purchases" of securities, create a "strong inference" of insider trading); *SEC v. Warde*, 151 F.3d 42, 47–48 (2d Cir. 1998) (defendant's access to insider information, coupled with pattern of phone calls and stock purchases, provided sufficient evidence of insider trading to support jury verdict); *Scoppetoulo*, 2011 WL 294443, at *3 ("The SEC also sets forth specific factual allegations that reveal a pattern of phone calls, text messages, meetings, stock purchases and subsequent trading resulting in profit * * *. The SEC sufficiently pleads *scienter* insomuch as the SEC alleges that Defendants were in possession of the information thereby giving 'rise to a strong inference of use' due to the suspicious timing of the communications and trading.").

## IV.    Conclusion

For the reasons set forth above, Defendants' motions to dismiss [29, 36] are respectfully denied.

Dated: August 3, 2011

_____
Robert M. Dow, Jr.
United States District Judge