# Exhibit 30

## DECLARATION OF NICHOLAS J. WEIR

I, Nicholas J. Weir, do hereby declare under penalty of perjury in accordance with 28 U.S.C. § 1746, that the following is true and correct:

1.      My name is Nicholas J. Weir.  I am a Vice President at Charles River Associates in Chicago, Illinois.

2.      The United States Securities and Exchange Commission retained me as a testifying expert in *SEC v. Steffes et al.*, 10-cv-6266 (N.D. Ill.).  A fair and accurate copy of my expert report dated May 24, 2013 is attached as Exhibit A to this Declaration.

3.      At trial, I anticipate that I would testify and offer opinions consistent with the opinions expressed in my report.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 04, 2013.


_____

Nicholas J. Weir

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 10-cv-6266 |
| v. | Hon. Thomas M. Durkin |
| | Magistrate Judge Susan E. Cox |
| REX C. STEFFES, CLIFF M. STEFFES, REX R. STEFFES, and BRET W. STEFFES, | |
| Defendants. | |

**EXPERT REPORT OF NICHOLAS J. WEIR**

**May 24, 2013**

# Table of Contents

I.    Introduction ............................................................................................................. 1

II.    Background ............................................................................................................. 4

    **A.** Investment Characteristics of Stocks and Options ........................................... 4

        **1.**   Common Stock ................................................................................... 4

        **2.**   Options ............................................................................................. 5

    **B.** Case Background ........................................................................................... 10

III.    Summary of Opinions ........................................................................................... 13

IV.    Mr. Steffes' FECI Trades were Unusual and Inconsistent with Prior and Subsequent Trading Behavior ................................................................................................. 14

    **A.** Mr. Steffes Had No Significant Trading History in FECI ............................. 17

    **B.** Mr. Steffes' Trades in FECI Were Unusually Large ...................................... 18

    **C.** Mr. Steffes' Trades in FECI Were Unusually Profitable ............................... 19

    **D.** Mr. Steffes' Trades in FECI Included Unusual Options Trading ................... 21

    **E.** Mr. Steffes' Trades in FECI Options Were Risky ........................................ 22

    **F.** Mr. Steffes' Trades in FECI Represented an Unusually High Proportion of Portfolio 23

    **G.** Mr. Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth ........................................................................................................... 24

    **H.** Mr. Steffes' Other Trading Activity in Railroads Was Minimal ................... 25

V.    The FECI Trades for Bret Steffes, Cliff Steffes and Rex R. Steffes Share Similar Characteristics with Mr. Steffes' FECI Trades ...................................................... 26

    **A.** Bret Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior ........................................................................ 27

        **1.**   Bret Steffes Had No Significant Trading History in FECI ............... 27

        **2.**   Bret Steffes' Trades in FECI Were Unusually Large ....................... 27

        **3.**   Bret Steffes' Trades in FECI were Unusually Profitable ................... 28

        **4.**   Bret Steffes' Trades in FECI Included Unusual Options Trading ...... 29

        **5.**   Bret Steffes' Trades in FECI Options Were Risky ........................... 30

        **6.**   Bret Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth ....................................................................................... 31

    **B.** Cliff Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior ........................................................................ 32

        **1.**   Cliff Steffes Had No Significant Trading History in FECI ............... 32

        **2.**   Cliff Steffes' Trades in FECI Were Unusually Large ....................... 33

**3.** Cliff Steffes' Trades in FECI Were Unusually Profitable ....................................34

**4.** Cliff Steffes' Trades in FECI Included Unusual Options Trading .......................35

**5.** Cliff Steffes' Trades in FECI Options Were Risky ...............................................35

**6.** Cliff Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth ...............................................................................................37

**C.** Rex R. Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior ...............................................................................38

**1.** Rex R. Steffes Had No Trading History in FECI ................................................38

**2.** Rex R. Steffes' Trades in FECI Were Unusually Large ........................................38

**3.** Rex R. Steffes' Trades in FECI Were Unusually Profitable ................................39

**4.** Rex R. Steffes' Trades in FECI Included Unusual Options Trading....................40

**5.** Rex R. Steffes' Trades in FECI Options Were Risky............................................41

**6.** Rex R. Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth...............................................................................................42

**D.** Bret, Cliff and Rex R. Steffes Had Little or No History of Making Profitable Trades Prior to Investing in FECI in 2007 ..................................................................43

**VI.** Defendants' Stated Reasons for FECI Trading Behavior Do Not Justify Their Unusual Investments in FECI...............................................................................................44

**A.** Undervalued Real Estate at FECI Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades..................................................................44

**B.** An Increase in Trading Volumes Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades..................................................................46

**C.** Warren Buffett's April 9, 2007 Announcement Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades .......................................50

**D.** Mr. Steffes' Explanation Equating FECI to a Short Term Investment Like a Bank Deposit Is Not a Reasonable Explanation for the 2007 FECI Investment ...................51

**E.** Investools "Buy" Signals Are Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades..................................................................52

**F.** Favorable Analyst Reports Are Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades..................................................................55

## List of Exhibits and Appendices

Exhibit II-1:      Rex C. Steffes, Summary of Investments in FECI in 2007

Exhibit II-2:      FECI Stock Price and Volume, 1/1/2007 – 5/31/2007

Exhibit II-3:      Bret Steffes, Summary of Investments in FECI in 2007

Exhibit II-4:      Cliff Steffes, Summary of Investments in FECI in 2007

Exhibit II-5:      Rex R. Steffes, Summary of Investments in FECI in 2007

Exhibit IV-1:      Rex C. Steffes, Size of Investment by Company, 1/1/2002 – 5/8/2007

Exhibit IV-2:      Rex C. Steffes, Size of Investment by Company, 2/2/2007 – 5/8/2007

Exhibit IV-3:      Rex C. Steffes, Size of Investment (Notional) by Company, 1/1/2002 – 5/8/2007

Exhibit IV-4:      Rex C. Steffes, Size of Investment (Notional) by Company, 2/2/2007 – 5/8/2007

Exhibit IV-5:      Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2002 – 12/31/2008

Exhibit IV-6:      Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2002 – 5/8/2007

Exhibit IV-7:      Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 12/31/2007

Exhibit IV-8:      Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 5/8/2007

Exhibit IV-9:      Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2002 – 12/31/2008

Exhibit IV-10:     Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2002 – 5/8/2007

Exhibit IV-11:     Rex C. Steffes, Net Capital Gains (Losses) from Trading Securities by Investment Period, 1/1/2002 – 12/31/2008

Exhibit IV-12:     Rex C. Steffes, Net Capital Gains (Losses) by Company, 1/1/2002 – 12/31/2008

Exhibit IV-13:     Rex C. Steffes, Net Capital Gains (Losses) by Company, 1/1/2002 – 5/8/2007

Exhibit IV-14:     Rex C. Steffes, Net Capital Gains (Losses) by Security Type, 1/1/2007 – 12/31/2007

Exhibit IV-15:    Rex C. Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2002 – 12/31/2008

Exhibit IV-16:    Rex C. Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2002 – 5/8/2007

Exhibit IV-17:    Rex C. Steffes, Net Capital Gains (Losses) from Trading Options by Company, 1/1/2002 – 12/31/2008

Exhibit IV-18:    Rex C. Steffes, Breakdown of Value of FECI Options

Exhibit IV-19:    Rex C. Steffes, Portfolio Percentage Investment by Company

Exhibit IV-20:    Rex C. Steffes, Portfolio Percentage Investment by Company

Exhibit IV-21:    Comparison of Rex C. Steffes' 2004 -2006 Adjusted Gross Income to FECI 2007 Investment

Exhibit IV-22:    Rex C. Steffes, Liquid Net Worth

Exhibit IV-23:    Rex C. Steffes, Investment in Railroad Companies, 1/1/2002 -12/31/2008

Exhibit IV-24:    Rex C. Steffes, Investment (Notional) in Railroad Companies, 1/1/2002 – 12/31/2008

Exhibit V-1:      Bret Steffes, Size of Investment by Company, 1/1/2004 – 5/8/2007

Exhibit V-2:      Bret Steffes, Size of Investment (Notional) by Company, 1/1/2004 – 5/8/2007

Exhibit V-3:      Bret Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2004 – 12/31/2008

Exhibit V-4:      Bret Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2004 – 5/8/2007

Exhibit V-5:      Bret Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 12/31/2007

Exhibit V-6:      Bret Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 5/8/2007

Exhibit V-7:      Bret Steffes, Net Capital Gains (Losses) from Trading Securities by Investment Period, 1/1/2004 – 12/31/2008

Exhibit V-8:      Bret Steffes, Net Capital Gains (Losses) by Company, 1/1/2004 – 12/31/2008

Exhibit V-9:      Bret Steffes, Net Capital Gains (Losses) by Company, 1/1/2004 – 5/8/2007

Exhibit V-10:     Bret Steffes, Net Capital Gains (Losses) by Security Type, 1/1/2007 – 12/31/2007

Exhibit V-11:     Bret Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2004 – 12/31/2008

Exhibit V-12:     Bret Steffes, Net Capital Gains (Losses) from Trading Options, 1/1/2004 – 5/8/2007

Exhibit V– 13:    Bret Steffes, Net Capital Gains (Losses) from Trading Options by Company, 1/1/2004 – 12/31/2008

Exhibit V-14:     Bret Steffes, Breakdown of Value of FECI Options

Exhibit V-15:     Cliff Steffes, Size of Investment by Company, 1/1/2004 – 5/8/2007

Exhibit V-16:     Cliff Steffes, Size of Investment (Notional) by Company, 1/1/2004 – 5/8/2007

Exhibit V-17:     Cliff Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2004 – 12/31/2008

Exhibit V-18:     Cliff Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2004 – 5/8/2007

Exhibit V-19:     Cliff Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 12/31/2007

Exhibit V-20:     Cliff Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 5/8/2007

Exhibit V-21:     Cliff Steffes, Net Capital Gains (Losses) from Trading Securities by Investment Period, 1/1/2004 – 12/31/2008

Exhibit V-22:     Cliff Steffes, Net Capital Gains (Losses) by Company, 1/1/2004 – 12/31/2008

Exhibit V-23:     Cliff Steffes, Net Capital Gains (Losses) by Company, 1/1/2004 – 5/8/2007

Exhibit V-24:     Cliff Steffes, Net Capital Gains (Losses) by Security Type, 1/1/2007 – 12/31/2007

Exhibit V-25:     Cliff Steffes, Net Capital Gains (Losses) from Trading Options, 1/1/2004 – 12/31/2008

Exhibit V-26:     Cliff Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2004 – 5/8/2007

Exhibit V-27:     Cliff Steffes, Net Capital Gains (Losses) from Trading Stock Options by Company, 1/1/2004 – 12/31/2008

Exhibit V-28:     Cliff Steffes, Breakdown of Value of FECI Options

Exhibit V-29:     Rex R. Steffes, Size of Investment by Company, 1/1/2006 – 5/8/2007

Exhibit V-30:    Rex R. Steffes, Size of Investment (Notional) by Company, 1/1/2006 – 5/8/2007

Exhibit V-31:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2006 – 12/31/2008

Exhibit V-32:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2006 – 5/8/2007

Exhibit V-33:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 12/31/2007

Exhibit V-34:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Securities, 1/1/2007 – 5/8/2007

Exhibit V-35:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Securities by Investment Period, 1/1/2006 – 12/31/2008

Exhibit V-36:    Rex R. Steffes, Net Capital Gains (Losses) by Company, 1/1/2006 – 12/31/2008

Exhibit V-37:    Rex R. Steffes, Net Capital Gains (Losses) by Company, 1/1/2006 – 5/8/2007

Exhibit V-38:    Rex R. Steffes, Net Capital Gains (Losses) by Security Type, 1/1/2007 – 12/31/2007

Exhibit V-39:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2006 – 12/31/2008

Exhibit V-40:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Stock Options, 1/1/2006 – 5/8/2007

Exhibit V-41:    Rex R. Steffes, Net Capital Gains (Losses) from Trading Stock Options by Company, 1/1/2006 – 12/31/2008

Exhibit V-42:    Rex R. Steffes, Breakdown of Value of FECI Options

Exhibit V-43:    Bret, Cliff, and Rex R. Steffes, Summary of Non-FECI Trades, Through 5/8/2007

Exhibit V-44:    Bret, Cliff, and Rex R. Steffes, Summary of Profitability, Through 5/8/2007

Exhibit VI-1:    FECI Stock Price and Volume, 1/1/ 07 – 3/28/07

Exhibit VI-2:    FECI Option Call Contract Volume, 2/15/2007 – 5/8/2007

Exhibit VI-3:    FECI Option Call Contract Volume, 2/15/2007 – 4/1/2007

Exhibit VI-4:    FECI Option Call Contract Volume, 2/15/2007 – 4/16/2007

Appendix A:     Curriculum Vitae for Nicholas J. Weir

Appendix B:     Documents Considered

## I.       Introduction

1.        My name is Nicholas J. Weir.  I have been retained by counsel from the Securities and

Exchange Commission to review the trading of Rex C. Steffes, Cliff M. Steffes, Rex R. Steffes

and Bret W. Steffes in stock and options of Florida  East Coast Industries ("FECI") preceding the

announcement of FECI's acquisition by Fortress Investment Group LLC ("Fortress") on May 8,

2007.  I have been asked to opine on various aspects of stocks, options and securities trading, and

to examine whether Defendants' trades in FECI stock and options were consistent with insider

trading.

2.        On September 30, 2012, the Securities and Exchange Commission ("SEC" or "Plaintiff")

filed a complaint (the "Complaint") against Rex C. Steffes ("Mr. Steffes"), Cliff M. Steffes

("Cliff Steffes"), Rex R. Steffes, Bret W. Steffes ("Bret Steffes," collectively, the "Defendants")

and others[1] alleging that Defendants committed violations of Section 10(b) by investing in FECI

based upon confidential and material information from which they received personal benefit.[2]

The SEC requests the Court to order Defendants "to disgorge the ill-gotten gains from each trade

in Florida East Coast securities which either they, or the persons they tipped, entered into on the

basis of material nonpublic information, including prejudgment interest thereon."[3]

3.        I have been involved in trading and markets and in the evaluation of related risks for over

thirty years.  At the beginning of my career, I served as a Trader for Cargill, Inc. in the United

States and for Tradax Gestion, S.A. (a Cargill affiliate in Geneva, Switzerland).  I later served as

---

[1] Robert J. Steffes and W. Gary Griffiths were also named as defendants in the Complaint.  I understand that the SEC has settled with both of them.

[2] Complaint, ¶¶ 66-68.

[3] Complaint, pp. 21-22.  The Complaint also requests the imposition of civil penalties.

Trading Manager for Cargill Investor Services ("CIS") in Chicago. I have specialized and continue to specialize in the trading of derivative instruments. I have traded in equity, debt, commodity and foreign exchange derivatives in both exchange-traded and over the counter markets in the US and abroad. While at CIS, I was the Trading Manager for the Managed Asset Group and later the Portfolio Diversification Group. My responsibilities included supervision of the underwriting and syndication of funds as well as the due diligence of Trading and Investment Advisors on behalf of public customers of CIS. I also served as Trading Manager of the Chicago Regional Office of CIS which served as a broker to both retail and institutional investors. While at CIS, I was responsible for the oversight of trading, compliance with regulatory requirements and the evaluation of trading and investment risk exposures of our funds and public clients.

4.      Following my experience with the Cargill group of companies, I joined Coopers & Lybrand ("C&L") where I became a Partner. C&L later became PricewaterhouseCoopers. My consulting practice at C&L involved advising large and sophisticated trading counterparties, regulatory authorities, stock exchanges, investment banks, insurance companies, pension plans, mutual funds, hedge funds, and individuals. The subject matter of my consulting related to trading policy and procedure issues, regulatory issues, trading and investment strategy, and risk. While at C&L I developed a system for the detection of unusual trading patterns that was acquired by the Enforcement Division of the New York Stock Exchange.

5.      I left C&L to form Chicago Partners, which was an academically-based consulting firm. While at Chicago Partners I was also one of the founding partners of CPRM which was a consulting firm that provided risk management expertise to a broad range of market participants. I was also a co-founder of Bluesuit (a broker-dealer that provided back-office execution on a

private-label basis for commercial banks and financial institutions). I was also a founder of Chicago Alternative Investment Advisors ("CAIP"), a series of broadly-based fund portfolios.

6.      In 2008, Chicago Partners was sold to Navigant Consulting Inc., and became a subsidiary of Navigant Consulting Inc. called Navigant Economics. In early 2013, I and many of my partners left Navigant Economics to join Charles River Associates ("CRA"), where I currently serve as a Vice President.

7.      I have also been involved in the enforcement of the rules of the S.E.C. and C.F.T.C. having served as an arbitrator for the National Association of Security Dealers ("NASD"), and its successor entity the Financial Industry Regulatory Authority ("FINRA"), as well as the National Futures Association ("NFA"). I have been registered and licensed as a registered representative of FINRA and an Associated Person of the NFA. I testified as an expert on behalf of the prevailing party in a landmark case (DeKwiatkowski vs. Bear Stearns) involving the duties of counterparties and brokers in trading in over the counter and exchange traded transactions.

8.      My CV is attached to this report as Appendix A.

9.      This report sets forth the subject matters on which I expect to testify, the substance of the opinions that I have formulated to date, and a summary of the foundations for each such opinion. In preparing this report, I have considered various documents related to these issues (see the documents cited in the text, exhibits, and footnotes of this report and Appendix B). My work on this matter is ongoing. I may modify or supplement my opinions as additional data, facts, or information become available, including but not limited to the report(s) of the Defendants' expert(s) in this matter.

10.     CRA bills the time I have spent on this matter at the rate of $640/hour. I have been assisted in my work by other CRA professionals with billing rates between $140 and $550/hour. My compensation is not dependent on the outcome of this matter.

11.     Section II discusses the background of the case.  Section III presents a summary of my opinions.  Section IV evaluates the trading behavior of Mr. Steffes.  Section V evaluates the trading behavior of Bret Steffes, Cliff Steffes and Rex R. Steffes.  Section VI evaluates the Defendants' stated reasons for their investments in FECI during 2007.  The exhibits to this report are to be incorporated into this report by reference.

## II.     Background

### A.     Investment Characteristics of Stocks and Options

#### 1.     Common Stock

12.     Bodie, Kane & Marcus ("BKM"), authors of the textbook *Investments*, state that common stocks, "also known as equity securities or equities, represent ownership shares in a corporation."[4]  One of the most important characteristics of common stock as an investment is that it represents a residual claim on the firm.  That is, "stockholders are the last in line of all those who have a claim on the assets and income of a corporation."[5]

---

[4] *Investments*, 7th Edition.  Bodie, Zvi, Alex Kane and Alan J. Marcus.  McGraw-Hill Irwin, 2008.  Hereafter, "BKM [2008]." P. 38.

[5] BKM [2008], p. 39.

13.     The return on holding a common stock depends on the price change and the dividend payout.  The holding period return, as a percentage of beginning price, is equal to the change in price of the common stock, plus the dividend, divided by the beginning price.[6]

14.     An important concept in investing is "Diversification," which BKM note can be summarized by the phrase, "Don't put all of your eggs in one basket."[7]   If one only owns one stock, "[and] that stock suffers a serious downturn, [the investor's] portfolio will sustain the full brunt of the decline."  By investing in a broad portfolio of stocks, an investor can reduce the risk of firm-specific losses.[8]  Holding an undiversified portfolio unnecessarily subjects the investor to negative outcomes.

### 2.     Options

15.     The characteristics of options are discussed by the Options Clearing Corporation ("OCC") in a publication entitled, "Characteristics and Risks of Standardized Options."[9],[10]  The OCC describes options:

> What is an option? An option is the right either to buy or to sell a specified amount or value of a particular underlying interest at a fixed exercise price by exercising the option before its specified expiration date. An option which gives a

---

[6] BKM [2008], p. 134.

[7] BKM [2008], p. 209.

[8] BKM [2008], pp. 206-207.

[9] "Characteristics and Risks of Standardized Options," February 1994 (1997 through 2012 Supplements Included), American Stock Exchange LLC, Chicago Board Options Exchange, Incorporated, New York Stock Exchange, Inc., NYSE Arca, Inc., and Philadelphia Stock Exchange, Inc.  Hereafter  referred to as "OCC [1994]."

[10] The OCC describes itself as, "The Options Clearing Corporation is the sole issuer of all securities options listed at the CBOE, four other U.S. stock exchanges and the National Association of Securities Dealers, Inc. (NASD), and is the entity through which all CBOE option transactions are ultimately cleared. As the issuer of all options, OCC essentially takes the opposite side of every option traded."  http://www.cboe.com/learncenter/faq.aspx, downloaded on April 6, 2013.

right to buy is a call option, and an option which gives a right to sell is a put
option.[11]

16.     Standardized characteristics of option contracts, and terms used in describing options

contracts include:

**EXERCISE PRICE -** In the case of a physical delivery option, the exercise price
(which is sometimes called the "strike price") is the price at which the option
holder has the right either to purchase or to sell the underlying interest.[12]

**EXPIRATION DATE -** This is the date on which the option expires.  If an
option has not been exercised prior to its expiration, it ceases to exist - that is, the
option holder no longer has any rights, and the option no longer has any value.[13]

**UNIT OF TRADING; CONTRACT SIZE -** The unit of trading (which is
sometimes referred to as the contract size) of a physical delivery option is the
amount of the underlying interest that is subject to being purchased or sold upon
the exercise of a single option contract. For example, the unit of trading for most
options on equity securities is 100 shares. Thus, a physical delivery XYZ 50 call
will give its holder the right upon exercise to purchase 100 shares of XYZ at $50
per share. If the option is trading at a premium of, say, $4 per share, then the
aggregate premium for a single option contract would be $400.[14]

**PREMIUM -** The premium is the price that the holder of an option pays and the
writer of an option receives for the rights conveyed by the option. It is the price
set by the holder and writer, or their brokers, in a transaction in an options market
where the option is traded. It is not a standardized term of the option. The
premium does not constitute a "down-payment." It is simply and entirely a
nonrefundable payment in full-from the option holder to the option writer-for the
rights conveyed by the option.[15]

**LONG and SHORT -** The word long refers to a person's position as the holder of
an option, and the word short refers to a person's position as the writer of an
option.[16]

---

[11] OCC [1994], p. 1.

[12] OCC [1994], p. 6.

[13] OCC [1994], p. 7.

[14] OCC [1994], p. 8.

[15] OCC [1994], p. 11.

[16] OCC [1994], p. 13.

**AT THE MONEY -** This term means that the current market value of the underlying interest is the same as the exercise price of the option.[17]

**IN THE MONEY -** A call option is said to be in the money if the current market value of the underlying interest is above the exercise price of the option. A put option is said to be in the money if the current market value of the underlying interest is below the exercise price of the option.[18]

**OUT OF THE MONEY-** If the exercise price of a call is above the current market value of the underlying interest, or if the exercise price of a put is below the current market value of the underlying interest, the option is said to be out of the money by that amount.[19]

**INTRINSIC VALUE and TIME VALUE -** It is sometimes useful to consider the premium of an option as consisting of two components: intrinsic value and time value. Intrinsic value reflects the amount, if any, by which an option is in the money. Time value is whatever the premium of the option is in addition to its intrinsic value.[20]

17.     Owning an options contract is riskier than owning the underlying stock on which the options contract is written. For example, a call option contract has intrinsic value to the extent the stock price on the date the contract is acquired exceeds the strike price of the option; any remaining investment represents the time value of the option, or premium paid. Option trades are essentially a bet that the stock price will rise to fully compensate for the decline in the time value of the option. If the stock price falls below the strike price and expires, the option contract has no value and the entire amount of the investment is lost. If the investor owns the underlying stock (instead of an options contract), he retains the stock itself and the investor can typically recover a portion of his original investment. The OCC further explains that purchasing or selling options is a risky undertaking:

---

[17] OCC [1994], p. 14.

[18] OCC [1994], p. 14.

[19] OCC [1994], p. 14.

[20] OCC [1994], p. 14.

An option holder runs the risk of losing the entire amount paid for the option in a relatively short period of time. This risk reflects the nature of an option as a wasting asset which becomes worthless when it expires. An option holder who neither sells his option in the secondary market nor exercises it prior to its expiration will necessarily lose his entire Investment in the option.[21]

The fact that options become valueless upon expiration means that an option holder must not only be right about the direction of an anticipated price change in the underlying interest, but he must also be right about when the price change will occur. If the price of the underlying interest does not change in the anticipated direction before the option expires to an extent sufficient to cover the cost of the option, the investor may lose all or a significant part of his investment in the option. This contrasts with an investor who purchases the underlying interest directly and may continue to hold his investment, notwithstanding its failure to change in price as anticipated, in the hope of waiting out an adverse price move and eventually realizing a profit.[22]

The significance of this risk to an option holder depends in large part upon the extent to which he utilizes the leverage of options to control a larger quantity of the underlying interest than he could have purchased directly with the same investment amount.[23]

18.     The time-to-expiration of these options is also significant because once they expire, the time value of the options is zero.  If the stock price does not rise enough within the time to expiration so that the intrinsic value is more than the time value of the option, the investor will suffer a loss on his position.  The shorter the time-to-expiration, the greater is the risk associated with the option contract.  Further, if an option contract is acquired when it is out of the money (i.e., for a call contract, the stock price is lower than the strike price), there is a greater risk to the investor.  The OCC further explains the riskiness associated with these two factors:

The more an option is out of the money and the shorter the remaining time to expiration, the greater the risk that an option holder will lose all or part of his investment in the option. The greater the price movement of the underlying interest necessary for the option to become profitable (that is, the more the option

---

[21] OCC [1994], p. 58.

[22] OCC [1994], p. 58.

[23] OCC [1994], p. 58.

is out of the money when purchased and the greater the cost of the option) and the shorter the time within which this price movement must occur, the greater the likelihood that the option holder will realize a loss. This does not necessarily mean that an option must be worthwhile to exercise in order for a holder to realize a profit. Instead, it may be possible for the holder to realize a profit by selling an option prior to its expiration for more than its original cost even though the option never becomes worthwhile to exercise. (The shorter the time remaining until expiration the less likely it is that this will be possible.)[24]

19.     As outlined above, there are greater risks associated with investing in stock options relative to investing in the underlying stocks themselves.  Along with this greater risk comes the opportunity to leverage one's investment and amplify returns.  Although options can result in a complete loss of one's investment, they can also result in much larger leveraged gains if the underlying stock price moves in the investor's favor.  For example, suppose a stock investor makes a $1,000 investment in 100 shares of stock at $10 per share, and a call option investor makes a $1,000 investment in 500 call option contracts at $2 per contract, giving him the right to buy stock at $8 per share.[25]  If the stock price rises to $20 and both investors liquidate their positions, the stock investor earns $1,000 ($20 per share * 100 shares less the original $1,000 investment) while the call investor would earn five times that amount, $5,000 (($20 market price less $8 strike price) * 500 contracts – the original $1,000 original investment).  Alternatively, if the stock price remains at $8 per share and both investors liquidate their positions, the stock investor loses only $200 ($8 per share * 100 shares – the original $1,000 investment) and the call investor loses his entire investment, $1,000 (($8 market price – $8 strike price) * 500 contracts - $1,000).

---

[24] OCC [1994], pp. 59-60.

[25] For purposes of this simple example, the time value of the option is not considered.

20.     In summary, purchasing options is a risky investing activity.  All else being equal, the risk of loss is higher if an option is out-of-the-money (rather than in-the-money).  The risk of loss is also higher the shorter the time to expiration.

    **B.     Case Background**

21.     Cliff Steffes, a Defendant in this case, and W. Gary Griffiths ("Griffiths"), a former Defendant in this case, were employees of Florida East Coast Railway, LLC ("FECR"), one of FECI's wholly owned subsidiaries, through May 2007.[26]  Cliff Steffes, Rex R. Steffes and Bret Steffes are sons of Mr. Steffes, and collectively are the Defendants in this matter.[27]  Griffiths is Mr. Steffes' brother-in-law.[28]  The Defendants are all natural persons.

22.     "FECI is a holding company incorporated in 1983 and is engaged, through wholly owned subsidiaries, in the railroad and real estate businesses.  The Company's railroad subsidiary, Florida East Coast Railway, LLC (FECR or Railway), connects many of the major population centers and port facilities of Florida's east coast, and provides efficient service for its customers through multiple competitive connections to the rest of North America.  The Company, primarily through its real estate arm, Flagler Development Group (Flagler), is engaged in the acquisition, entitlement, development, management, construction, leasing, operation and selected sale of real estate in Florida, primarily office and industrial property, as well as undeveloped land."[29]  On May 8, 2007, FECI announced that it had entered into a merger agreement with entities "owned

---

[26] Complaint, ¶¶2, 30, 31.

[27] Complaint, ¶3.  Robert J. Steffes and W. Gary Griffiths were also named in the Complaint.  I understand that the SEC has settled with both of these former defendants.

[28] Complaint, ¶3.

[29] 2006 10-K Filing for FECI, p. 3.

by certain private equity funds managed by affiliates of Fortress Investment Group LLC [("Fortress")][30] under which each share of stock would be eligible to receive $62.50 in cash as well as a special dividend of $21.50 which would be paid "no later than one day prior to the effective time of the Merger."[31] FECI's stock price closed at $84.91 per share that day, May 8, 2007, a 14.5% increase from its closing price on the prior day.[32] The report of Rona T. Seams, an expert hired by the Plaintiff ("Seams Report"), reached the conclusion that FECI's excess stock return on May 8, 2007, the announcement date of the merger, was statistically significant and due to the announcement, indicating that this information was material to the market.[33]

23.    The SEC alleges that Griffiths and Cliff Steffes, employees of FECI, shared material, confidential and nonpublic information with the Defendants in the period preceding the sale of FECI and that the Defendants personally profited on investments in FECI made as a result of this information.[34] As defined by the Plaintiff, "[i]llegal insider trading refers generally to buying or selling a security, in breach of a fiduciary duty or other relationship of trust and confidence, while in the possession of material, nonpublic information about the security. Insider trading violations may also include 'tipping' such information, securities trading by the person 'tipped,' and securities trading by those who misappropriate such information."[35] Material nonpublic information is information which, if made public, would be considered relevant to investors and

---

[30] 8-K filing by FECI dated May 8, 2007.

[31] 8-K filing by FECI dated May 8, 2007. Potential payouts for one share of FECI stock aggregate to $84.00, or $62.50 + $21.50.

[32] CRSP. Closing prices on May 7 and May 8, 2007 were $74.13 and $84.91, respectively.

[33] Expert Report of Rona T. Seams dated March 28, 2013 ("Seams Report"), pp. 13-14.

[34] Complaint, ¶¶66-68.

[35] http://www.sec.gov/spotlight/insidertrading.shtml.

could include information about dividends, earnings, management changes, acquisitions, or a tender offer for shares, among other things.[36]

24.     Exhibit II-1 summarizes Mr. Steffes' ownership in FECI during 2007 beginning on March 28, 2007 and ending on May 8, 2007, a holding period of 42 days.  As shown in this exhibit, Mr. Steffes invested $1,149,459 in FECI, all of which was sold on May 8, 2007 for $1,754,049, resulting in a gain of $604,590.[37]  Exhibit II-2 illustrates the stock price and volume for FECI for the period from January 1, 2007 through May 31, 2007 and indicates Mr. Steffes' buy and sell dates during this time frame.

25.     Exhibit II-3 summarizes Bret Steffes' ownership in FECI during 2007 beginning on March 29, 2007 and ending on May 8, 2007, a holding period of 41 days.  As shown in this exhibit, Bret Steffes invested $31,196 in FECI, all of which was sold by May 8, 2007 for $134,955, resulting in a gain of $103,759.  His maximum investment in FECI was $18,568 as of May 1, 2007.

26.     Exhibit II-4 summarizes Cliff Steffes' ownership in FECI during 2007 beginning April 3, 2007 and ending May 8, 2007, a holding period of 36 days.  As shown in this exhibit, Cliff Steffes invested $15,086 in FECI, all of which was sold on May 8, 2007 for $66,878, resulting in a gain of $51,793.

27.     Exhibit II-5 summarizes Rex R. Steffes' ownership in FECI during 2007 beginning on March 29, 2007 and ending on May 8, 2007, a holding period of 41 days.  As shown in this

---

[36] http://www.investopedia.com/exam-guide/cfa-level-1/ethics-standards/standard-nonpublic-information.asp, CFA Level 1 – Standard II-A: Material Nonpublic Information.

[37] For the sake of simplicity, calculations of capital gains on trades are calculated by subtracting the purchase price (which includes commission and fees) from net proceeds.  Net proceeds are calculated by subtracting commissions and fees from gross proceeds.

exhibit, Rex R. Steffes invested $30,958 in FECI, all of which was sold by May 8, 2007 for $136,292, resulting in a gain of $105,334. His maximum investment in FECI was $17,543 as of May 1, 2007

### III. Summary of Opinions

28.     My analyses provide a framework by which to determine whether the Defendants' trades in FECI were indicative of trading based upon material nonpublic information. I offer no legal interpretations or legal opinions. After analyzing the trading behavior of the Defendants, I conclude that the trading behavior of the Defendants is unusual and inconsistent with either their prior or subsequent trading behavior, or both. For all Defendants, I reach this conclusion by reviewing the size of the investment, its profitability, the type of investment and the relationship of the investment to their net worth. I also considered FECI's concentration within Rex C. Steffes' portfolio as well as past investing experience in railroads. For all Defendants, I further note that certain elements of the Defendants' trades in FECI securities were inherently more risky than other types of investments.

29.     In the last section of my report, I examine the reasons identified by the Defendants for their 2007 investment in FECI during the course of their depositions. The Defendants have failed to offer any reasonable explanation for the magnitude and concentration of their investments relative to their other investments and net worth. Based on the reasons given by the Defendants, it is my opinion that no reasonable investor would have reached the conclusion to invest such a significant and concentrated portion of his net worth in FECI. On the other hand, had the Defendants been in possession of material nonpublic information, these kinds of investments would be completely consistent with the possession of that type of information.

30.     Considered together, I conclude that the FECI investments in 2007 by the Defendants are most consistent with trading based upon material nonpublic information.

**IV.     Mr. Steffes' FECI Trades were Unusual and Inconsistent with Prior and Subsequent Trading Behavior**

31.     The analyses summarized here provide a framework by which to examine Mr. Steffes' trading behavior for FECI.  This information has been gathered from a combination of personal annual tax filings and brokerage account records.  In reaching my conclusions, I have considered investments in publicly-traded securities.[38]  I have treated Mr. Steffes' investments in real estate and rental properties as separate asset classes from the equity investment in FECI.

32.     I have also reviewed Mr. Steffes' commodity trading in the context of his investment in FECI.  Records for Mr. Steffes' commodity trading were reviewed for the period from February 21, 2007 to November 20, 2008.  I understand that commodities trading data is not available prior to February 2007.  Mr. Steffes' personal tax filings from 2002 through 2006 report a net gain (loss) from trading in his FC Stone account of ($9,154), ($4,515), $10,430, $11,060 and ($12,056), respectively, for a net capital loss of ($4,235).[39]

33.     In 2007, the largest gain or loss on any commodity futures trade was $5,500 with trades of either two or four contracts.[40]  The largest premium paid or received on an options trade was

---

[38] This data was gathered through a review of the securities trades identified in Mr. Steffes' income tax filings for the years 2002 through 2008 and verified using brokerage statements and trading confirmations, including AG Edwards, Charles Schwab and Edward Jones.  In the event of discrepancies, the brokerage statements and trading confirmations are relied upon.  For example, there are three trades during 2005 that Mr. Steffes failed to include in his 2005 income tax filing.  Further, I have also excluded from this analysis the activity in AG Edwards account 5909-6962 which I understand was directed by a professional investment advisor, not Mr. Steffes.   The inclusion of the gains and losses from AG Edwards account 5909-6962 would not alter my opinions regarding Mr. Steffes' trading activity.

[39] Income tax filings for Rex C. and Lori Steffes for the years 2002 – 2006.

[40] Rex C. Steffes Deposition Exhibit 27.

$15,905 with four call contracts.[41] The largest number of options purchased was ten contracts.[42] With each option trade Mr. Steffes' potential loss was limited to the premium he paid so his risk on any option trade did not exceed $15,905 in 2007.

34.     In 2008, the largest gain or loss on a commodity futures contract was $17,600 on four gold contracts and the largest gain or loss on any options trade was $42,312 on four cotton call options.[43] As was true in 2007, Mr. Steffes' losses on any given trade were limited to the premium paid and did not exceed the largest premium paid of $42,312. Total losses on Mr. Steffes' commodity trading, as reported by FC Stone, for 2007 were $40,092 and for 2008, $51,164.[44] Overall, Mr. Steffes incurred net capital commodities losses from 2002 through 2008 of $95,491 ($4,235+$40,092+$51,164).

35.     In the period of 2007 and 2008 combined the available records reflect that Mr. Steffes bought a total of 26 futures contracts (in each instance fewer than four contracts per trade).[45] He also bought a total of 86 option contracts (76 calls and 10 puts and in each case no larger than 10 contracts per trade).[46] The trades were placed in silver, corn, gold, soybeans and cotton.

36.     Mr. Steffes' trading in the single stock of FECI contrasts sharply in its concentration, the magnitude of the overall risk exposure taken and the profitability of the trades when compared

---

[41] Ibid.

[42] Ibid.

[43] Ibid.

[44] Ibid. In his 2008 personal income tax filing, Mr. Steffes reported a loss of $84,449 from FC Stone, not the $51,164 reflected on the FC Stone accounts.

[45] Rex C. Steffes Deposition Exhibit 27.

[46] Ibid.

with Mr. Steffes' trading commodities. In the case of FECI, Mr. Steffes bought a total of 15,800 shares of FECI stock for an investment of $994,869.[47] He also bought 225 option contracts for a leveraged option investment of $154,590 in April of 2007, or a notional investment in the stock of $1,549,948 (each option contract represents 100 shares of stock, the total option purchase represents 22,500 shares averaging $69 per share).[48] Mr. Steffes sold both the stocks and options for $1,754,049 resulting in a profit of $604,590 immediately following the announcement of Fortress' acquisition of FECI on May 8, 2007.[49] Each of the options that were purchased by Mr. Steffes expired on June 16, 2007 (slightly over just a month following the announcement of the acquisition of FECI).

37.     I consider Mr. Steffes' real estate and rental properties as distinctly different investments as their investment time horizon is typically significantly longer (lasting years) than shorter term commodity futures, options or stock options. Real estate and rental property investments are conducted privately without a liquid public market for trading. Included in this category would be the sale of Mr. Steffes' ownership interest in a private entity during 2007 which owned a racetrack. I understand that he acquired this interest initially by donating land to the racetrack; accordingly, this investment is unlike a publicly-traded security and more similar to his other real estate holdings.

---

[47] See Exhibit II-1.

[48] See Exhibit II-1. Measured notionally, the 225 options contracts equate to 22,500 notional shares with notional value of $1,549,948. This number is calculated by adding the notional value of each option purchase together. The notional value is calculated by multiplying the number of options contracts purchased by 100 shares per contract by the market price on the date the option contract is purchased. Or, (66 contracts *100 shares per contract *$66.36 market price, or $437,976) + (34 contracts *100 shares per contract *$66.58 market price, or $226,372) + (25 contracts *100 shares per contract *$72.20 market price, or $180,500) + (100 contracts *100 shares per contract *$70.51 market price, or $705,100) = $1,549,948. See also Exhibit IV-18.

[49] See Exhibit II-1.

38.     This section of the report will analyze Mr. Steffes' trading in FECI securities and demonstrate that:

- Mr. Steffes had no prior significant investing history with FECI.

- Mr. Steffes' FECI trades were unusually large.

- Mr. Steffes' FECI trades were unusually profitable.

- Mr. Steffes' FECI trades included unusual options trading.

- Mr. Steffes' FECI option trades were risky.

- Mr. Steffes' trades in FECI represented an unusually high proportion of his investment portfolio.

- Mr. Steffes' trades in FECI investments were a large proportion of his income and net worth.

- Mr. Steffes' other trading activity in railroads was minimal.

39.     Based upon this evidence, I conclude that the FECI investment in 2007 by Mr. Steffes is most consistent with trading based upon material nonpublic information.

### A.      Mr. Steffes Had No Significant Trading History in FECI

40.     Based on the information available, prior to March 28, 2007, Mr. Steffes had purchased FECI on only one other occasion.  On December 15, 2005, he acquired 200 shares of FECI for $8,569 and sold those shares 28 days later for a net gain of $689.[50]   By way of comparison, he

---

[50] 2006 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes, Schedule D.

acquired 38,300 notional shares from March 28, 2007 through April 30, 2007, investing approximately $1,149,459 and selling his entire position on May 8, 2007 for a gain of $604,590.[51] This investment is 134 times larger than his prior holding during 2005.

### B.      Mr. Steffes' Trades in FECI Were Unusually Large

41.      Mr. Steffes' investments in FECI securities were unusually large, measured relative to his investment in other securities.

42.      Exhibit IV-1 ranks each of Mr. Steffes' investments by size of investment in each company's securities during the period from January 1, 2002 through May 8, 2007, the date on which he sold his FECI holdings.  Each bar on this chart represents the maximum investment in each company's securities and is measured using the maximum dollar value of shares purchased plus dollar value of options contracts purchased as of the end of any trading day in the investment period shown.  As seen in this exhibit, Mr. Steffes' maximum investment in FECI securities, as indicated by the red bar, was $1,149,459.  His investment in FECI was by far the largest investment of all company securities, 45 times as great as his average maximum investment in other (non-FECI) securities (with an average investment of only $25,424).[52]

43.      Exhibit IV-2 reports the same information from February 2, 2007 through May 8, 2007, beginning on the date on which he received a $2.8 million cash inflow presumably from the sale of investment in a privately held race track and ending on the date on which he sold his FECI

---

[51] Notional shares are measured by adding shares in stock to shares controlled by the acquisition of options contract. Each option contract represents 100 notional shares.  For example, if Mr. Steffes acquired 1 share of stock and 1 options contract, the total notional shares acquired would equal 101 [1 share of stock plus 100 shares associated with the 1 option contract.]  See also Exhibit II-1.

[52] Maximum investment is used to measure maximum exposure at any point in time instead of aggregate investment during the trading period because Mr. Steffes buys and sells certain company securities on several occasions throughout the trading period.

holdings.[53]  Over this period Mr. Steffes' investment in FECI securities of $1,149,459 was still the largest investment, more than 100 times the average of other firm securities with an average investment of $10,766.

44.     Exhibit IV-3 ranks each of Mr. Steffes' investments by size of notional investment in each company's securities during the period from January 1, 2002 through May 8, 2007, up through the date on which he sold his FECI holdings.  Each bar on this chart represents the maximum notional investment in each company's securities and is measured using the maximum dollar value of the shares purchased plus the dollar value of the shares for which he purchased option contracts at the end of any trading day during the investment period shown.  As measured by notional value, the contrast between Mr. Steffes' investment in FECI and his investment in other company's securities is even starker.  Mr. Steffes' notional investment in FECI was $2,544,817, which is almost 100 times larger than his average notional investment in other securities of $25,424.  Exhibit IV-4 shows this same information from February 2, 2007 through May 8, 2007, which demonstrates again that Mr. Steffes' notional investment in FECI was larger than his notional investments in other company's securities for this period as well.

45.     Based upon this data, I conclude that Mr. Steffes' investment in the securities of FECI was unusually large relative to his investments in other securities.

### C.     Mr. Steffes' Trades in FECI Were Unusually Profitable

46.     Exhibit IV-5 compares capital gains on securities for the trading information provided from 2002 through 2008. [54]  As shown in this exhibit, his trades in other securities yield

---

[53] 2007 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes.  Harris Bank Statements (Rex C. Steffes Deposition Exhibit 33 at STE005209).

aggregate capital losses of $9,962 versus the $605,279 in capital gains that Mr. Steffes received from his FECI trades for the same period. Exhibit IV-6 reduces the time frame of this comparison to the date on which he sold his FECI holdings, May 8, 2007. As demonstrated in this exhibit, over the period from January 1, 2002 through May 8, 2007, his aggregate net capital gains were $12,902 from all other securities, substantially less than the $605,279 in capital gains from his FECI trades for the same period.[55] Exhibit IV-7 illustrates similar results for his trading in the calendar year 2007. Finally, Exhibit IV-8 reports Mr. Steffes' capital gains from trading in the securities of FECI, compared to all of his trading in other securities during 2007 up through the date on which he sold his FECI holdings, or January 1, 2007 through May 8, 2007.[56] As seen in this exhibit, during this time frame, Mr. Steffes had capital gains on FECI of $604,590, compared to aggregate net capital losses of $6,350 for all other securities.

47.     Exhibits IV-9, IV-10 and IV-11 illustrate Mr. Steffes' net capital gains and losses aggregated over various time frames. In each of these exhibits, his capital gains in FECI securities are shown in red. Again, Mr. Steffes' capital gains in FECI securities dwarfed those of his net capital gains or losses in other securities over any time frame considered.

48.     Exhibit IV-12 ranks Mr. Steffes' capital gains for each company's securities over the period from January 1, 2002 through December 31, 2008, the period for which trading data was available. As before, FECI is shown in red. As seen in this exhibit, the $605,279 capital gain

---

[54] The earliest financial information made available for Mr. Steffes is his 2002 personal income tax filing.

[55] As discussed above, Mr. Steffes had FECI capital gains in 2006 of $689 which, when added to his gains in 2007, $604,590, result in an aggregate gain of $605,279 [$689 + $604,590 = $605,279].

[56] For purposes of this analysis and all exhibits in this section of this report, capital gains are measured as the difference between the sales proceeds, net of commissions, and the acquisition cost of the securities, including commissions. Dividend income would not be expected to alter these conclusions.

that he received in FECI was significantly larger than his gains (or losses) on his investments in any other company's securities, with an average capital loss of $120. Exhibit IV-13, which shows this same information over the period January 1, 2002 through May 8, 2007, the date on which he sold his FECI holdings, yields similar results with the capital gains on other securities averaging $258.

49.     Mr. Steffes had a significant return on his FECI investment. During his 42 day holding period, Mr. Steffes earned a return of 52.6% on his 2007 FECI investment.[57]  Mr. Steffes' annualized return on his 2007 FECI investment would be 3,836.6%, assuming, conservatively, that all his purchases were made on the first day of his holding period, March 28, 2007.[58]  Note that adjusting the analysis to reflect the actual investment dates for purchases made after the initial purchase date, would result in an even higher annualized return.

50.     As a result of these data and analyses, I conclude that Mr. Steffes' trades in FECI were unusually profitable relative to his trades in other securities.

### D.     Mr. Steffes' Trades in FECI Included Unusual Options Trading

51.     Based on the records available to me, prior to his purchase of options on FECI stock, Mr. Steffes had never invested in stock options at all.[59]  However, as demonstrated in Exhibit II-1,

---

[57] Mr. Steffes' return is calculated by dividing his proceeds ($1,754,049) by his original investment ($1,149,459) and subtracting 1, or [($1,754,049/ $1,149,459) – 1].

[58] Mr. Steffes' annualized return is calculated by dividing his proceeds ($1,754,049) by his original investment ($1,149,459), annualizing this number by raising this amount to the days in the year divided by the holding period, or 365/42, and subtracting 1, or [($1,754,049/ $1,149,459)^(365/42) – 1].

[59]  In his 2001 application to FC Stone, Mr. Steffes did not identify any prior stock option trading experience.  (See Rex C. Steffes Deposition Exhibit 27 at FCST 000023) The trading records available for Mr. Steffes indicate that there was no stock option trading activity prior to his FECI options trades on April 17, 2007.  Before that date, I understand that Mr. Steffes did not have authorization to trade stock options in his AG Edwards account.  (Rex C. Steffes Deposition Exhibit 29)

between March 28, 2007 and April 30, 2007, he purchased options on FECI stock at a total cost of $154,590.   Based upon his prior history, this purchase was unprecedented.  Exhibit IV-14 illustrates Mr. Steffes' net capital gains or losses from stocks relative to options during 2007. Exhibit IV-15 reports Mr. Steffes' capital gains by year on option trading from January 1, 2002 through December 31, 2008.  This graph indicates that Mr. Steffes did trade in other company's options in 2007 after his FECI trades, but he had a $56,506 net capital loss on these other trades. In contrast, he had a capital gain of $276,045 on his FECI option trades.

52.     Exhibit IV-16 reports Mr. Steffes' net capital gains or losses by year on option trading from January 1, 2002 through May 8, 2007, the date on which he sold his FECI holdings, which indicates that his FECI trades were the only option trades during this period.  As shown in this chart, there are no gains or losses on non-FECI options prior to May 8, 2007.

53.     Exhibit IV-17 illustrates Mr. Steffes' capital gains or losses from trading stock options for each company in which he traded options over the period from January 1, 2002 through December 31, 2008.  All of the non-FECI option trades occurred after his FECI option trades. As seen in this exhibit, his FECI option trading profits of $276,045 were substantially more profitable than his non-FECI option trades which had an average capital loss of $7,063.

54.     Based upon these data and analyses, I conclude that Mr. Steffes' trading in FECI included unusual option trades.

### E.     Mr. Steffes' Trades in FECI Options Were Risky

55.     As discussed above, options that expire out-of-the-money are worthless.  Even "in the money" options carry risk because the stock price must rise sufficiently to compensate the

investor for the time value of the options. All else being equal, the shorter the time to the expiration date, the greater the risk.

56.     Exhibit IV-18 documents each of Mr. Steffes' FECI option purchases. This exhibit identifies the type of option (call vs. put), the number of contracts, the expiration date, the purchase date, trading days through expiration, the stock price on the purchase date, the strike price, and the breakdown of that purchase price into intrinsic value and time value. As seen in this exhibit, Mr. Steffes purchased relatively short-dated options; the longest-dated option purchases on April 17, 2007 had 43 trading days before expiration, while the shortest-dated option purchase on April 30, 2007 had only trading 34 days before expiration.

57.     The short time-to-expiration of these options is significant, because, as of expiration date, the time value these options would be zero. If the stock price did not rise enough so that the intrinsic value increased by more than the time value of the option, then Mr. Steffes would suffer a loss on his position. For instance, if the FECI stock price remained unchanged, then Mr. Steffes would suffer a loss of the time value of the option ($54,642) or 35.3% of the amount he originally invested.

58.     The option trading by Mr. Steffes was risky. These trades were a bet that the stock price would rise to fully compensate for the decline in the time value of the option.

### F.     Mr. Steffes' Trades in FECI Represented an Unusually High Proportion of Portfolio

59.     Mr. Steffes' 2007 investment in FECI securities, which had an acquisition cost of $1,149,459 (Exhibit II-1), represented an unusually large proportion of his securities portfolio. Exhibit IV-19 illustrates with two pie charts Mr. Steffes' portfolio of security investments as

measured by his original investment cost on March 27, 2007, immediately prior to his first purchase of FECI in 2007, and on May 7, 2007, immediately prior to the sale of his FECI holdings. In these charts, each color represents a different company's securities. FECI is shown in red. As seen in this exhibit, his FECI holdings as a percentage of his securities portfolio, as measured by original investment cost, went from 0% on March 27, 2007, to 82.13% on May 7, 2007. Exhibit IV-20 reports the same data using a column format where each bar shows the size of the investments over time within the portfolio as well as the percentage of FECI of the total portfolio, which grows to 82.13% as of May 7, 2007.

60.     Mr. Steffes' investment in FECI represented an unusually large proportion of his securities portfolio. This position left him poorly diversified. In the absence of inside information about the prospects of FECI, such a position would subject Mr. Steffes to substantial losses if FECI stock performed poorly.

### G.     Mr. Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth

61.     Mr. Steffes' 2007 investment in FECI of more than $1.1 million was extremely large relative to his income. Exhibit IV-21 documents that his investment in FECI relative to his adjusted gross income for the three years prior to his substantial investment in FECI during 2007. As seen in this exhibit, his 2007 investment in FECI was larger than his adjusted gross income in any of the prior three years.

62.     Exhibit IV-22 illustrates Mr. Steffes' investment in FECI relative to his liquid net worth, defined as cash plus investments in stocks, options and metals.[60]  On March 27, 2007,

---

[60] For comparison purposes, investments in stocks, options and metals are shown at cost and not adjusted to market value.

immediately prior to his first purchase of FECI, Mr. Steffes' liquid net worth was held 75% in cash and 25% in security or metals investments. By May 7, 2007, immediately prior to the sale of his FECI holdings, his liquid net worth was 17% cash, 23% investment in non-FECI securities and metals and 60% FECI, a significant shift in a short time frame.

63.     As shown above, Mr. Steffes' investments in the securities of FECI were large relative to his income and his liquid net worth. Again, due to the undiversified nature of his position in FECI, a poor performance of FECI stock would expose Mr. Steffes to substantial losses relative to his income and liquid net worth.

### H.     Mr. Steffes' Other Trading Activity in Railroads Was Minimal

64.     Mr. Steffes did not have a significant history of investments in railroad companies. Exhibit IV-23 documents his annual investments in railroad securities. As seen in this exhibit, in 2006 he made a relatively small investment of $8,569 in FECI.[61] He sold this investment after 28 days for a gain of $689.[62] In 2007, he made an investment of $4,764 in Canadian National Railways ("CNR"), which was small relative to his $1,149,459 investment in FECI that year.[63] Exhibit IV-24 modifies this analysis to show his annual investments, measured notionally, in railroad securities. As shown in these exhibits, Mr. Steffes had minimal trading in railroads prior to his substantial investment in FECI, shortly prior to the takeover announcement at issue in this matter.

---

[61] See also his 2006 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes, Schedule D.

[62] 2006 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes, Schedule D.

[63] See Exhibit II-1. His investment in Canadian National Railway was sold 98 days later for a gain of $511. (2007 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes, Schedule D.)

**V.      The FECI Trades for Bret Steffes, Cliff Steffes and Rex R. Steffes Share Similar Characteristics with Mr. Steffes' FECI Trades**

65.      As stated in the summary of opinions, the analyses summarized here provide a framework by which to examine Bret, Cliff and Rex R.  Steffes' trading behavior for FECI.  I have reviewed and analyzed their trading behavior of publicly-traded investments in securities.[64] To gather this information, I have primarily relied upon the electronic trading data from OptionsXpress as well as the associated account statements and their personal tax filings.[65] This section of the report and will demonstrate that:

- Bret, Cliff and Rex R. Steffes had no prior significant investing history with FECI.

- Bret, Cliff and Rex R. Steffes' FECI trades were unusually large.

- Bret, Cliff and Rex R. Steffes' FECI trades were unusually profitable.

- Bret, Cliff and Rex R. Steffes' FECI trades included unusual options trading.

- Bret, Cliff and Rex R. Steffes' FECI option trades were risky.

- Bret, Cliff and Rex R. Steffes' trades in FECI investments were a large proportion of their income and net worth.

---

[64] Based upon the available information, I am unaware of any other securities investments held by Mr. Steffes' sons outside of the OptionsXpress.

[65] This data was  gathered from the electronic trading data produced in this matter for Bret Steffes, Cliff Steffes and Rex R. Steffes for their OptionsXpress accounts and their personal income tax filings.   All buy trades were matched with sale trades on a first in first out ("FIFO") basis which  assumes that, in the event of multiple purchases of a company's securities, the first purchase is the first group of shares sold.  In the event of discrepancies, the OptionsXpress electronic trading data has been relied upon.  For example,  in 2006, Cliff Steffes failed to include in his annual tax filing the net capital gain of $541 identified by trades closed in 2006 and reflected in the OptionsXpress account statements and electronic trading data.   Bret Steffes also failed to report in his 2006 annual income tax filing additional net losses associated with expired options and other trades.

66.     Based upon this evidence, I conclude that the FECI investments in 2007 by Bret, Cliff and Rex R. Steffes are most consistent with trading based upon material, nonpublic information.

### A.     Bret Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior

#### 1.     Bret Steffes Had No Significant Trading History in FECI

67.     Based on the information available, prior to March 29, 2007, Bret Steffes had purchased FECI on one other occasion.[66]  He acquired 50 shares on December 14, 2005 for $2,168 and sold those shares 29 days later for a net gain of $132.[67]   By way of comparison, Bret Steffes acquired a total of 11,250 notional shares from March 29, 2007 through May 1, 2007, investing a total of $31,196.[68]  During this investment time frame, he sold a total of 50 shares on April 2 and April 3, 2007 as well as options contracts representing 1,700 notional shares on May 1, 2007 and the balance of his position, or options contracts representing 9,500 notional shares, by May 8, 2007, for a total gain of $103,759.[69, 70]

#### 2.     Bret Steffes' Trades in FECI Were Unusually Large

68.     Exhibit V-1 ranks Bret Steffes' investments by size of maximum investment in each company's securities during the period from January 1, 2004 through May 8, 2007, the date on

---

[66] The data for this analysis was gathered through a combination of OptionsXpress electronic data, account statements and income tax filings from 2004 through 2008.  Using the electronic data from OptionsXpress, trades have been matched on a first in, first out (or "FIFO") basis.

[67] OptionsXpress.

[68] See Exhibit II-3.

[69] See Exhibit II-3.

[70] Notional shares are measured by adding shares in stock to shares controlled by the acquisition of options contract. Each option contract represents 100 notional shares.  For example, if Bret Steffes acquired 1 share of stock and 1 options contract, the total notional shares acquired would equal 101 [1 share of stock plus 100 shares associated with the 1 option contract.]

which he sold his FECI holdings.[71] As seen in this exhibit, his maximum investment in FECI, $18,568, represents the largest investment he made during the period shown, higher than the $3,116 average of other non-FECI investments. However, given the level of options activity for Bret Steffes, it is especially important to consider his notional investments to have an understanding of the size of his position relative to investments in other company's securities.[72]

69.     Exhibit V-2 ranks each of his investments by size of maximum notional investment in each company's securities during the period from January 1, 2004 through May 8, 2007, the date on which he sold his FECI holdings. As measured by notional value, the contrast between Bret Steffes' notional investment in FECI relative to his investment in any other company's securities is dramatic. His FECI investment measured notionally of $630,090 is significantly higher than any other investment, with an average maximum notional investment of $16,897.

70.     Based upon this data, I conclude that Bret Steffes' investment in the securities of FECI was unusually large relative to his investments in other securities.

### 3.     Bret Steffes' Trades in FECI were Unusually Profitable

71.     Bret Steffes' trades in FECI were unusually profitable. Exhibit V-3 reports capital gains from trading in the securities of FECI, compared to net capital gains or losses on trading in other securities from January 1, 2004 through December 31, 2008.[73] As seen in this exhibit, during

---

[71] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum investment for each company's securities equals the maximum dollar value of shares purchased plus dollar value of options contracts purchased as of the end of the trading day in the investment period shown.

[72] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum notional investment for each company's securities equals the maximum dollar value of the shares purchased plus the dollar value of the shares for which he purchased option contracts at the end of any trading day during the investment period shown.

[73] For purposes of this analysis and all exhibits in this section of this report, capital gains are measured as the difference between the sales proceeds, net of commissions, and the acquisition cost of the securities. Dividend income would not be expected to alter these conclusions.

this time frame, the capital gains on FECI securities, as shown in red, was $103,891, significantly higher than the aggregate net capital loss for all other non-FECI securities of $3,194. Exhibits V-4, V-5, V-6, and V-7 document the same conclusion when the comparison is expanded to various different date ranges. Bret Steffes' net activity in non-FECI securities typically results in net capital losses.

72.     Exhibit V-8 ranks Bret Steffes' capital gains for each company's securities over the period from January 1, 2004 through December 31, 2008. As before, FECI is shown in red. As seen in this exhibit, the $103,891 in capital gains that he received on FECI are significantly larger than the gains (or losses) on his investments in any other company's securities relative to capital gains (or losses) across these other investments during this period which average a capital loss of $86. Exhibit V-9 shows this same information over the period January 1, 2004 through May 8, 2007, the date on which he sold his FECI holdings and yields similar results with FECI showing a gain of $103,891 and average capital losses from non-FECI companies of $86.

73.     Prior to his investment in FECI, 11 out of 17 trades were unprofitable.[74]

74.     As a result of these data and analyses, I conclude that Bret Steffes' trades in FECI were unusually profitable relative to his trades in other securities.

### 4.     Bret Steffes' Trades in FECI Included Unusual Options Trading

75.     Exhibit V-10 illustrates Bret Steffes' net capital gains or losses from stocks relative to options for the year 2007. Exhibit V-11 reports Bret Steffes' capital gains by year on options trading from January 1, 2004 through December 31, 2008. As before, FECI is shown in red and

---

[74] Buy and sell trades are matched on a first-in-first-out (FIFO) basis. Total transactions are based on sale transactions. See also Exhibit V-43.

the aggregate activity of all other company's securities is shown in blue. Exhibit V-12 reports the period of analysis through May 8, 2007, the date on which he sold his FECI holdings. In all graphs, the $103,697 capital gain on FECI stock options significantly exceeds the net capital losses on trades of stock options.

76.     Exhibit V-13 illustrates Bret Steffes' capital gains or losses from trading stock options for each company in which they traded options over the period from January 1, 2004 through December 31, 2008. As before, FECI is shown in red. As seen in this exhibit, Bret Steffes' FECI option trades were substantially more profitable with capital gains of $103,697, than his non-FECI option trades on any other company which averaged a loss of $513.

77.     Based upon these data and analyses, I conclude Bret Steffes' trading in FECI included unusual option trades.

### 5.      Bret Steffes' Trades in FECI Options Were Risky

78.     As discussed above, options that expire out-of-the-money are worthless. Exhibit V-14 details Bret Steffes' FECI option purchases. This exhibit documents the type of option (call vs. put), the number of option contracts, the expiration date, the purchase date, the trading days to expiration, the FECI stock price on the purchase date of the option, the strike price and the breakdown of that purchase price into intrinsic value and time value. As seen in this exhibit, he purchased relatively short-dated options; the longest-dated option purchases had 53 trading days before expiration, while the shortest-dated option purchase acquired on May 1, 2007 had only 33 trading days before expiration.

79.     The short time-to-expiration of these options is significant, because, as of the expiration date, the time value of these options would be zero. If the stock price did not rise enough so that

the intrinsic value rose by more than the time value of the option, he would suffer a loss on his position.  For example, if the FECI stock price remained unchanged for the options which were eventually sold on May 8, 2007, then Bret Steffes would suffer losses of the full time value of the options, or $18,248.  Two of his options purchases were out-of-the-money when he bought them meaning that if the price of the stock did not improve he was at risk to lose his entire investment.  Further, Bret sold in-the-money option contracts on May 1, 2007 and bought out-of the money options contracts on the same day at a higher strike price, exposing him to even greater risk if the stock price failed to rise.

80.     I conclude that Bret Steffes' FECI option trades were inherently risky because they were largely out of the money with short expiration dates.[75]  Further, they were bought shortly before the May 8, 2007 announcement date and sold immediately thereafter. This trading behavior is a characteristically classic indication of someone attempting to profit from material nonpublic information.

### 6.     Bret Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth

81.     Bret Steffes' net maximum investment in FECI ($18,568) was large relative to his adjusted gross income of $2,174 in 2004, $2,930 in 2005 and $1,806 in 2006.[76]  Bret Steffes' 2007 investment in FECI was larger than his adjusted gross income in any of the prior three years.

---

[75] Two of the three option contract holdings as of May 7, 2007 were acquired when they were out of the money and the remaining option contract had an intrinsic value of only $320.  (See Exhibit V-14)

[76] Bret Steffes Income Tax Filing for 2004 (Form 1040EZ), 2005 (Form 1040) and 2006 (Form 1040).

82.    On March 28, 2007, immediately prior to his first purchase of FECI, Bret Steffes' liquid

net worth[77] totaled $7,101 and included cash of $2,344 (33%) and other securities of $4,757

(67%).[78]  By May 7, 2007, immediately prior to the sale of his FECI holdings, his liquid net

worth totaled $19,278 and consisted of $711 of cash (4%) and FECI securities of $18,568 (96%),

a significant shift in a short time frame.[79]

83.    As shown above, Bret Steffes' investments in the securities of FECI were very large

relative to his income and his liquid net worth.  Due to the undiversified nature of his position in

FECI, a poor performance of FECI stock would expose Bret Steffes to substantial losses relative

to his income and liquid net worth.

**B.    Cliff Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior**

**1.    Cliff Steffes Had No Significant Trading History in FECI**

84.    Based on the available information, prior to April 3, 2007, Cliff Steffes had purchased

FECI on one other occasion.[80]  Cliff Steffes acquired 125 shares on February 17, 2006 for $6,256

and sold those shares 20 days later for a net loss of $4.[81]   By way of comparison, Cliff Steffes

---

[77] Liquid net worth is defined in the same way as it was defined for Mr. Steffes and includes cash plus investments in stocks, options and metals.  For comparison purposes, investments in stocks, options and metals are reported at cost and not adjusted to market value.

[78] OptionsXpress account statement for March 2007.  Harris Bank bank account statements.  Total cash is calculated by adding the balances in OptionsXpress, $1,617, and Harris, $727, for a total of $2,344.

[79] OptionsXpress account statement for May 2007.  Harris Bank account statements.  Total cash is calculated by adding the balances in OptionsXpress, $151, and Harris, $560, for a total of $711.  For the maximum investment in FECI, see Exhibit II-3.  Liquid net worth, as defined above, increased by approximately $10,000.

[80] The data for this analysis was gathered through a combination of OptionsXpress electronic data, account statements and income tax filings from 2004 through 2008.  Using the electronic data from OptionsXpress, trades have been matched on a first in, first out (or "FIFO") basis.

[81] OptionsXpress.

acquired 4,700 notional shares from April 3, 2007 through May 1, 2007, investing approximately $15,086 and selling his entire position on May 8, 2007 for a gain of $51,793.[82]

### 2. Cliff Steffes' Trades in FECI Were Unusually Large

85. Exhibit V-15 ranks Cliff Steffes' investments by size of investment in each company's securities during the period from January 1, 2004 through May 8, 2007, the date on which he sold his FECI holdings.[83] As seen in this exhibit, his $15,086 investment in FECI represents the largest investment he made during the period shown, higher than the average investment of $5,040 in non-FECI companies. However, given the level of options activity for Cliff Steffes, it is especially important to consider his notional investment to have an understanding of the size of his position relative to investments in other company's securities.[84]

86. Exhibit V-16 ranks each of his investments by size of notional investment in each company's securities during the period from January 1, 2004 through May 8, 2007, the date on which he sold his FECI holdings. As measured by notional value, Cliff Steffes' investment in FECI measured notionally was $317,870, dramatically larger than the $5,040 maximum notional investment in any other company's securities.

87. Based upon this data, I conclude that Cliff Steffes' investment in the securities of FECI was unusually large relative to his investments in other securities.

---

[82] See also Exhibit II-4.

[83] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum investment for each company's securities equals the maximum dollar value of shares purchased plus dollar value of options contracts purchased as of the end of the trading day in the investment period shown.

[84] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum notional investment for each company's securities equals the maximum dollar value of the shares purchased plus the dollar value of the shares for which he purchased option contracts at the end of any trading day during the investment period shown.

### 3. Cliff Steffes' Trades in FECI Were Unusually Profitable

88.     Exhibit V-17 reports capital gains from trading in the securities of FECI, compared to net capital gains or losses on trading in other securities from January 1, 2004 through December 31, 2008.[85]  As seen in this exhibit, during this time frame, the capital gains on FECI securities, as shown in red, were $51,789, are approximately ten times higher than aggregate net capital gain of $5,544 for all other non-FECI securities.  Exhibits V-18, V-19, V-20, and V-21 illustrate the same conclusion when the comparison is expanded to various different date ranges.

89.     Exhibit V-22 ranks Cliff Steffes' capital gains and losses for each company's securities over the period from January 1, 2004 through December 31, 2008.  As before, FECI is shown  in red.  As seen in this exhibit, the $51,789 capital gain on FECI was significantly larger than the average gain of $222 on his investment in any other company's securities.  Exhibit V-23 shows the same information over the period January 1, 2004 through May 8, 2007, the date on which he sold his FECI holdings, and yields similar results with his $51,793 gain on FECI holdings significantly exceeding the average gain of $46 other non-FECI securities.

90.     Prior to his investment in FECI, seven out of 12 investments aggregated by company were unprofitable.[86]

91.     As a result of these data and analyses, I conclude that Cliff Steffes' trades in FECI were unusually profitable relative to his trades in other securities.

---

[85] For purposes of this analysis and all exhibits in this section of this report, capital gains are measured as the difference between the sales proceeds, net of commissions, and the acquisition cost of the securities.  Dividend income would not be expected to alter these conclusions.

[86] See also Exhibit V-43.

Page 34

### 4. Cliff Steffes' Trades in FECI Included Unusual Options Trading

92.     Based on the information made available to me, Cliff Steffes' 2007 purchases of FECI stock options represented his first options investment and were unprecedented.  Exhibit V-24 documents Cliff Steffes' net capital gains or losses from stocks relative to options for the year 2007.  Exhibit V-25 reports Cliff Steffes' net capital gains or losses by year on options trading from January 1, 2004 through December 31, 2008.   As before, FECI is shown in red and the aggregate net activity of all other company's securities is shown in blue.  Exhibit V-26 limits the period of analysis through May 8, 2007, the date on which he sold his FECI holdings.  In both graphs, capital gains on FECI stock options significantly exceed the net capital losses on trades of stock options of other companies.

93.     Exhibit V-27 ranks Cliff Steffes' capital gains from trading stock options for each company in which he traded options over the period from January 1, 2004 through December 31, 2008.  As before, FECI is shown in red.  As seen in this exhibit, Cliff Steffes' FECI option trades were substantially more profitable at $51,793 relative to an average capital loss of $356 on his non-FECI option trades on any other company.

94.     Based upon these data and analyses, I conclude Cliff Steffes' trading in FECI included unusual option trades.

### 5. Cliff Steffes' Trades in FECI Options Were Risky

95.     As discussed above, options that expire out-of-the-money are worthless.  Exhibit V-28 identifies Cliff Steffes' FECI option purchases.  This exhibit details the type of option (call vs. put), the number of option contracts, the expiration date, the purchase date, the trading days until expiration, the FECI stock price on the purchase date of the option, the strike price, and the

breakdown of that purchase price into intrinsic value and time value. As seen in this exhibit, he purchased relatively short-dated options; the longest-dated option purchases had 52 trading days before expiration, while the shortest-dated option purchase acquired on May 1, 2007 had only 33 trading days before expiration.

96.     The short time-to-expiration of these options is significant, because, as of expiration date, the time of value these options would be zero. If the stock price did not rise enough so that the intrinsic value rose by more than the time value of the option, he would suffer a loss on his position. For example, if the FECI stock price remained unchanged for the options which were eventually sold on May 8, 2007, then Cliff Steffes would suffer losses of the full time value of the options, or $8,625. Two of his options purchases were out-of-the-money when he bought them meaning that if the price of the stock did not improve he was at risk to lose his entire investment.

97.     I conclude that Cliff Steffes' FECI option trades were inherently risky because they were largely out of the money with short expiration dates.[87] Further, they were bought shortly before the May 8, 2007 announcement date and sold immediately thereafter. This trading behavior is a characteristically classic indication of someone attempting to profit from material nonpublic information.

---

[87] Two of the three option contract holdings as of May 7, 2007 were acquired when they were out of the money and the remaining option contract had an intrinsic value of $6,460. (See Exhibit V-28.)

### 6. Cliff Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth

98.     Cliff Steffes' 2007 investment in FECI was a significant proportion of his income. Cliff Steffes' net maximum investment in FECI was $15,086 relative to his adjusted gross income of $11,110 in 2004, $44,223 in 2005 and $51,013 in 2006.[88]

99.     As it relates to liquid net worth,[89] on April 2, 2007, immediately prior to his first purchase of FECI, Cliff Steffes' liquid net worth totaled $3,798 and included cash of $3,798 (100%).[90] By May 7, 2007, immediately prior to the sale of his FECI holdings, his liquid net worth totaled $17,883 and consisted of $2,797 of cash (16%) and FECI securities of $15,086 (84%), a significant shift in a short time frame.[91]

100.     As shown above, Cliff Steffes' investments in the securities of FECI were large relative to his income and his liquid net worth. Again, due to the undiversified nature of his position in FECI, a poor performance of FECI stock would expose Cliff Steffes to substantial losses relative to his income and liquid net worth.

---

[88] Cliff Steffes Income Tax Filing for 2004 (Form 1040EZ), 2005 (Form 1040) and 2006 (Form 1040).

[89] Liquid net worth is defined using the same method applied to Mr. Steffes and includes cash, stocks, options and metals investments, measured at cost. For comparison purposes, investments in stocks, options and metals are shown at cost and not adjusted to market value.

[90] OptionsXpress account statement for April 2007. Bank account statements from Cliff Steffes Deposition Exhibit 9. Total cash is calculated by adding the balances in OptionsXpress, $2,126, and Cliff Steffes' bank account, $1,672, for a total of $3,798.

[91] OptionsXpress account statement for May 2007. Bank account statements from Cliff Steffes Deposition Exhibit 9. Total cash is calculated by adding the balances in OptionsXpress, $41, and Cliff Steffes' bank account, $2,756, for a total of $2,797. For the maximum investment in FECI, see Exhibit II-4. Liquid net worth, as defined above, increased by approximately $10,000.

### C. Rex R. Steffes' FECI Trades Were Unusual and Inconsistent with Prior and Subsequent Trading Behavior

#### 1. Rex R. Steffes Had No Trading History in FECI

101.    Based on the information made available to me, prior to March 29, 2007, Rex R. Steffes had never purchased FECI securities.[92]

#### 2. Rex R. Steffes' Trades in FECI Were Unusually Large

102.    Exhibit V-29 ranks Rex R. Steffes' investments by size of investment in each company's securities during the period from January 1, 2006 through May 8, 2007, the date on which he sold his FECI holdings.[93]   As seen in this exhibit, his investment in FECI represents the largest investment he made during the period shown at $17,543 relative to an average maximum investment in non-FECI companies of $1,509.   However, given the level of options activity for Rex R. Steffes, it is especially important to consider his notional investment to have an understanding of the size of his position relative to investments in other company's securities.[94]

103.    Exhibit V-30 ranks each of his investments by size of notional investment in each company's securities during the period from January 1, 2006 through May 8, 2007, the date on which he sold his FECI holdings.  As measured by notional value, the contrast between the Rex R. Steffes' notional investment in FECI relative to his investment in any other company's

---

[92] The data for this analysis was gathered through a combination of OptionsXpress electronic data, account statements and income tax filings from 2006 through 2008.  Using the electronic data from OptionsXpress, trades have been matched on a first in, first out (or "FIFO") basis.

[93] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum investment for each company's securities equals the maximum dollar value of shares purchased plus dollar value of options contracts purchased as of the end of the trading day in the investment period shown.

[94] Similar to the comparison conducted for his father, Mr. Steffes, the total maximum notional investment for each company's securities equals the maximum dollar value of the shares purchased plus the dollar value of the shares for which he purchased option contracts at the end of any trading day during the investment period shown.

securities is dramatic.  FECI's investment valued notionally of $630,090 is significantly higher than the $4,713 average of any other maximum notional investment.

104.    Based upon this data, I conclude that Rex R. Steffes' investment in the securities of FECI was unusually large relative to his investments in other securities.

### 3.    Rex R. Steffes' Trades in FECI Were Unusually Profitable

105.    Rex R. Steffes' trades in FECI were unusually profitable.  Exhibit V-31 reports capital gains from trading in the securities of FECI, compared to net capital gains or losses on trading in other securities from January 1, 2006 through December 31, 2008.[95]  As seen in this exhibit, during this time frame, the capital gains on FECI securities, as shown in red, were $105,334, significantly higher than aggregate net capital gains for all other non-FECI securities of $2,440. Exhibits V-32, V-33, V-34, and V-35 document the same conclusion when the comparison is expanded to various different date ranges.

106.    Exhibit V-36 ranks Rex R. Steffes' capital gains or losses for each company's securities over the period from January 1, 2006 through December 31, 2008.  As before, FECI is shown in red.  As seen in this exhibit, the $105,334 capital gain on FECI is significantly larger than the average $122 capital gain on his investments in any other company's securities.  Exhibit V-37 shows this same information over the period January 1, 2006 through May 8, 2007, the date on which he sold his FECI holdings.  Similarly, the $105,334 capital gain from FECI is significantly larger than the average capital loss of $213 for non-FECI securities.

---

[95] For purposes of this analysis and all exhibits in this section of this report, capital gains are measured as the difference between the sales proceeds, net of commissions, and the acquisition cost of the securities.  Dividend income would not be expected to alter these conclusions.

107.    Prior to his investment in FECI, 3 out of 4 investments aggregated by company were unprofitable.[96]

108.    As a result of these data and analyses, I conclude that Rex R. Steffes' trades in FECI were unusually profitable relative to his trades in other securities.

### 4.    Rex R. Steffes' Trades in FECI Included Unusual Options Trading

109.    Based on the information made available to me, Rex R. Steffes' purchases of FECI stock options represented his first options investment and were unprecedented.  Exhibit V-38 documents Rex R. Steffes' net capital gains or losses from stocks relative to options for the year 2007.  Exhibit V-39 reports Rex R. Steffes' capital gains and losses by year on options trading from January 1, 2006 through December 31, 2008.  As before, FECI is shown in red and the aggregate net activity of all other company's securities is shown in blue.  Exhibit V-40 limits the period of analysis through May 8, 2007, the date on which he sold his FECI holdings.  In all graphs, capital gains on FECI stock options significantly exceed the aggregate net capital losses on trades of stock options of other companies.

110.    Exhibit V-41 ranks Rex R. Steffes' capital gains from trading stock options for each company in which they traded options over the period from January 1, 2006 through December 31, 2008.  As before, FECI is shown in red.   As seen in this exhibit, Rex R. Steffes' FECI option trades were substantially more profitable earning $105,152 in capital gains relative to an average capital loss of $830 from his non-FECI option trades on any other company.

---

[96] See also Exhibit V-43.

111.    Based upon these data and analyses, I conclude Rex R. Steffes' trading in FECI included unusual option trades.

### 5.    Rex R. Steffes' Trades in FECI Options Were Risky

112.    As discussed above, options that expire out-of-the-money are worthless.  Exhibit V-42 identifies Rex R. Steffes' FECI option purchases.  This exhibit details the type of option (call vs. put), number of options contracts, the expiration date, the purchase date, the trading days until expiration, the FECI stock price on the purchase date of the option, strike price and the breakdown of that purchase price into intrinsic value and time value.  As seen in this exhibit, he purchased relatively short-dated options; the longest-dated option purchases had 53 trading days before expiration, while the shortest-dated option purchase acquired on May 1, 2007 had only 33 trading days before expiration.

113.    The short time-to-expiration of these options is significant, because, as of expiration date, the time of value these options would be zero.  If the stock price did not rise enough so that the intrinsic value rose by more than the time value of the option, he would suffer a loss on his position.  For example, if the FECI stock price remained unchanged for the options which were eventually sold on May 8, 2007, then Rex R. Steffes would suffer losses of the full time value of the options, or $17,223.  Two of his options purchases were out-of-the-money when he bought them meaning that if the price of the stock did not improve he was at risk to lose his entire investment.   Rex R. Steffes also sold in-the-money option contracts on May 1, 2007 and buying out-of the money options contracts on the same day at a higher strike price exposing him to even greater risk if the stock price failed to rise.

114.    I conclude that Rex R. Steffes' FECI option trades were inherently risky because they were largely out of the money with short expiration dates.[97]  Further, they were bought shortly before the May 8, 2007 announcement date and sold immediately thereafter.   This trading behavior is a characteristically classic indication of someone attempting to profit from material nonpublic information.

### 6.    Rex R. Steffes' Trades in FECI Represented a Large Proportion of Income and Net Worth

115.    Rex R. Steffes' 2007 investment in FECI was large relative to his income.  Rex R. Steffes' net maximum investment in FECI was $17,543 relative to his adjusted gross income (loss) of negative $892.[98]  I understand that Rex R. Steffes did not file an income tax return in 2004 or 2005.  Rex R. Steffes' 2007 investment in FECI was significantly larger than his adjusted gross income in the prior year.

116.    As it relates to liquid net worth,[99] on March 28, 2007, immediately prior to his first purchase of FECI, Rex R. Steffes' liquid net worth totaled $6,771 and included cash of $4,131 (61%) and a security at $2,640 $(39%).[100]  By May 7, 2007, immediately prior to the sale of his

---

[97] Two of the three option contract holdings as of May 7, 2007 were acquired when they were out of the money and the remaining option contract had an intrinsic value of $320.  (See Exhibit V-42.)

[98] Rex R. Steffes Income Tax Filing for 2006.

[99] Liquid net worth is defined using the same method applied to Mr. Steffes and includes cash, stocks, options and metals investments, measured at cost.  For comparison purposes, investments in stocks, options and metals are shown at cost and not adjusted to market value.

[100] OptionsXpress account statement for March 2007.  Harris Bank account statements.  Total cash is calculated by adding the balances in OptionsXpress, $4,039, and Harris, $93, for a total of $4,131.  The securities investment in the OptionsXpress account was ishares Silver Trust, $2,640.

FECI holdings, his liquid net worth totaled $18,955 and consisted of $1,412 of cash (7%) and FECI securities of $17,543 (93%), a significant shift in a short time frame.[101]

117.    As shown above, Rex R. Steffes' investments in the securities of FECI were very large relative to his income and his liquid net worth.  Again, due to the undiversified nature of his position in FECI, a poor performance of FECI stock would expose Rex R. Steffes to substantial losses relative to his income and liquid net worth.

### D.    Bret, Cliff and Rex R. Steffes Had Little or No History of Making Profitable Trades Prior to Investing in FECI in 2007

118.    This section summarizes the combined securities trading profitability of Mr. Steffes' three sons prior to their 2007 investment in FECI.  Exhibit V-43 reports the combined investing in 33 companies, excluding FECI, of all three of Mr. Steffes' sons.[102]   Of these investments, they managed to achieve profits on only 12 of the 33 securities investments.  Only five of these profitable investments, or 15.2% of the total, resulted in profits which exceeded $100.

119.    Exhibit V-44 illustrates the combined profitability of Mr. Steffes' sons prior to their 2007 FECI investment and compared to the profits achieved on that investment.[103]  Considered together, the brothers netted a capital loss of $1,759 on all other securities compared with a $261,014 capital gain on their investments in FECI.

---

[101]  OptionsXpress account statement for May 2007.  Harris Bank account statements.  Total cash is calculated by adding the balances in OptionsXpress, $1,320, and Harris, $93, for a total of $1,412.  For the maximum investment in FECI, see Exhibit II-5.  Liquid net worth, as defined above, increased by approximately $10,000.

[102] Every investment by company is counted; if more than one son invests in the same company, this investment is counted for each brother.  All investments in FECI are excluded.

[103] FECI gains or losses prior to 2007 are included in the column labeled FECI.

## VI.  Defendants' Stated Reasons for FECI Trading Behavior Do Not Justify Their Unusual Investments in FECI

120.     This section examines the reasons identified by the Defendants for their 2007 investments in FECI.  I understand that all of the Defendants invested in FECI for similar reasons and some of the Defendants explicitly relied on each other.  For purposes of simplicity and comprehensiveness, this section focuses on the reasons for FECI investing and trading offered by Mr. Steffes at his deposition.  The Defendants have failed to offer any reasonable explanation for the magnitude of their FECI investments relative to their other investments or net worth.  Based on the reasons given by the Defendants and discussed in greater detail below, it is my opinion that no reasonable investor would have engaged in the trades that Defendants made in FECI securities in 2007 in the absence of material, nonpublic information.

### A.     Undervalued Real Estate at FECI Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades

121.     In his deposition testimony, Mr. Steffes discusses his opinion of FECI's real estate assets from his observations during a train ride he took on FECI's railroad in late 2005.[104]   He opines that FECI's real estate assets were under-utilized and under-valued, specifically the rail yard near Miami.[105]   A train ride in 2005 does not satisfactorily explain a $1 million investment over 16 months later in 2007.  Immediately following this train ride, Mr. Steffes invested only $8,569 in FECI and held that investment for only 28 days before liquidating it in early 2006.[106]

---

[104] Deposition Testimony of Rex C. Steffes, September 14, 2012, 146:9 – 147:5; 148:3-22.

[105] Deposition Testimony of Rex C. Steffes, September 14, 2012, 148:3-22.

[106] 2006 Form 1040 U.S. Individual Tax Return for Rex C. and Lori Steffes, Schedule D.

122.    Further, the fact that FECI had a rail yard near Miami, as well as FECI's other real estate assets, was public information which was disclosed in FECI's annual reports and public filings.[107]  FECI's 2005 annual public filing identified and described each of the company's real estate assets in detail.[108]  Contemporaneous analyst reports during early 2007 also indicate that the value and performance of real estate assets was understood, discussed and evaluated by analysts, a contributing factor in the conclusions in their respective reports.[109]  Based upon these disclosures and information, market participants would have formed their own opinions regarding the value of FECI's real estate assets and, consequently, the value of these assets would be reflected in the FECI market stock price.  Mr. Steffes admits that he has made no attempt to independently value FECI's real estate holdings.[110]  There is no foundation for any assertion that these real estate assets were not fully valued in FECI's stock price.

123.    Additionally, Mr. Steffes and his sons purchased option contracts in late March, April and early May that expired in June 2007.  Even if FECI's stock price hypothetically did not reflect the value of its real estate assets, there is no reason to assume that the market price would incorporate this value during this relatively short window, when it purportedly had not since 2005, when Mr. Steffes took his train ride and allegedly viewed these assets.  Specifically, this would not be a reason to invest in short term call options unless one believed that the real estate would appreciate, and be reflected in FECI's stock price, in a very short period of time.   In his

---

[107] FECI 2006 10-K Filing, pp. 14-19

[108] FECI 2006 10-K Filing, pp. 14-19.

[109] Griffiths Deposition Exhibit 2.

[110] Deposition Testimony of Rex C. Steffes, October 25, 2012, 412:8-17.

testimony, Mr. Steffes held a contrary view.[111]   He stated that the commercial real estate market was "leveling off" during 2007 and that he had no reason to expect that FECI real estate would appreciate by June 2007.[112]   The lack of any expectation of an increase in value makes FECI real estate a poor rationale for investing in FECI stock or, more specifically, FECI options.

124.    Given that FECI's real estate holdings were public information already included in the stock price, FECI's real estate was not a reasonable basis for the Defendants' FECI investments in March through May of 2007.

### B.    An Increase in Trading Volumes Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades

125.    In his deposition testimony, Mr. Steffes makes several references to the increase in stock trading volume during March 2007 stating:  "I looked at the company, ***the volume doubling***, all of the arrows pointing up on the MACD; everything was going up on this stock.   It was ***very obvious to see that this company was, in fact, in play by the average volume doubling*** and that there was [sic] three buys on the Standard & Poor's and everything was pointing up." (***emphasis added***)[113]

126.    Exhibit VI-01 illustrates the stock trading volume and the price of FECI stock for the period from January 1, 2007 through March 28, 2007, the day of Mr. Steffes' first purchase of FECI during 2007.  A review of this data does indicate that, generally, trading volume in FECI rose from February onward.  By early March, stock trading volume was approximately twice as high as January, with peaks of almost three times the January volume.  But for every purchaser,

---

[111] Deposition Testimony of Rex C. Steffes, October 25, 2012, 416:5 – 418:9.

[112] Deposition Testimony of Rex C. Steffes, October 25, 2012, 416:5 – 418:9.

[113] Deposition Testimony of Rex C. Steffes, October 25, 2012, 406:23 – 407:4.

there is a seller. An increase in stock trading volume indicates that investors were buying FECI stock at a higher rate than in January, but they were also selling FECI stock at a higher rate than in January. A rise in stock trading volume alone does not indicate that the firm can be expected to perform well in the near future. Even Mr. Steffes acknowledges that increased volume does not necessarily predict future price increases.[114] Both price and volume changes need to be considered. In this case, FECI's net change in stock price was essentially flat, closing at $60.12 on January 3, 2007, and closing at $60.89 on March 27, 2007 (the day before Mr. Steffes' first purchase).[115] A reasonable investor would not conclude that it was "obvious" that a company is an acquisition target when volume is rising and the stock price is flat. This lack of price movement does not support any assertion by Mr. Steffes that an impending acquisition could be observed in the trading behavior of FECI stock.

127.    Mr. Steffes also suggests that an investor, or group of investors, was taking on large positions in FECI.[116] But that assertion does not follow from the stock trading volume data. An increase in stock trading volume is equally consistent with large investors, or groups of investors, selling FECI stock.

128.    Further, I note that stock trading volume can increase for a variety of reasons including, but not limited to, earnings announcements, acquisition and divestitures of significant assets, scandals, lawsuits, a successful product introduction or establishment of new patents as well as mergers or takeovers. Absent inside information, a reasonable investor would not necessarily conclude that an acquisition was obvious due to an increase in stock trading volume.

---

[114] Deposition Testimony of Rex C. Steffes, October 25, 2012, 519:1-5.

[115] CRSP.

[116] Deposition Testimony of Rex C. Steffes, October 25, 2012, 465:20 – 466:23.

129.    Mr. Steffes attributes some of the changes in stock trading volume and price to rumors of a FECI deal being published on March 23, 2007 in a dealReporter article although he was not personally aware of this article at the time of his investments.[117]  I understand that there is no information in the record to indicate that Mr. Steffes saw or was aware of this dealReporter article prior to his trades in FECI; accordingly, this article is irrelevant to his decision to trade.

130.    Further, it is not uncommon for a company to be subject to unfounded takeover rumors. The Seams Report concluded that there was no statistically significant return associated with the publication of these rumors in dealReporter on March 23, 2007 or on the dates of two other dealReporter articles on April 5, 2007 or May 3, 2007.[118]  This lack of stock market reaction means that the dealReporter articles were not significant to market participants.

131.    In addition to trading volume on FECI stock, I also evaluated trading volume for FECI call option contracts.  Exhibit VI-2 reports trading volume for FECI option contracts from the first available trading day, February 16, 2007 through May 8, 2007, the date on which the FECI sale was announced.  The Steffes' acquisition of option contracts is shown in red and all other market participants in blue.  This data illustrates that FECI option contract volume is generally low and sporadic until the end of April and that it spikes dramatically on May 2, 2007, one day after the Defendants made their last option contract purchase.

132.    Exhibit VI-3 illustrates the option contract volume before Bret and Rex R. Steffes made their first purchase of FECI option contracts on April 1, 2007.[119]  As shown in this exhibit,

---

[117] Deposition Testimony of Rex C. Steffes, October 25, 2012, 467:9 – 469:16.  The Seams Report identifies two other dealReporter articles on April 5, 2007 and May 3, 2007.

[118] Seams Report, pp. 16-17.  DealReporter articles dated March 23, 2007, April 5, 2007 and May 3, 2007.

[119] Cliff Steffes' first purchase is shortly thereafter on April 3, 2007. See Exhibit II-4.

option contract volume is very low with the majority of days reporting option contract volume of less than 10 contracts. There is no evidence of a spike or surge in option activity which could offer a reasonable explanation for their first trades.

133.    Exhibit VI-4 illustrates the option contract volume before Mr. Steffes made his first purchase of FECI options contract on April 17, 2007. Similar to his sons, this period shows low option contract volumes, some of which is comprised by his sons' purchases. There is no evidence of a spike or surge in option activity which could offer a reasonable explanation for Mr. Steffes' first trades.

134.    Upon review of this data, I conclude that there is no dramatic increase in option contract volume activity *prior* to the Defendants' purchase of options which might contribute to any reasonable trading decision. I do note the dramatic increase in option contract trading volume on May 2, 2007, a day *after* the Defendants' last purchase of options, which remains relatively high thereafter and conclude that, since it occurs after the Defendants' final purchase, this surge in volume cannot have contributed to their investment decision to invest in FECI options.

135.    As outlined earlier in this report, Mr. Steffes invested over $1 million in FECI, 60% of his liquid net worth and his sons invested between 84% to 96% of their liquid net worth as well. In any case, an increase in stock or option trading volume is not a rational basis to justify the magnitude or riskiness of the investments that Mr. Steffes and his sons made in FECI.

## C. Warren Buffett's April 9, 2007 Announcement Is Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades

136.    In his deposition testimony, Mr. Steffes discussed the news report on April 9, 2007 regarding Warren Buffett's announcement that he was investing in railroads, specifically Burlington Northern as well as two other unnamed railroads.[120]

137.    As outlined in Exhibit II-01, Mr. Steffes had already invested $886,094, or 77%, of the $1,149,459 he would eventually invest during 2007 prior to the Mr. Buffett's April 9, 2007 investment.  Clearly, Mr. Buffett's interest in railroads cannot have been the basis for investments that Mr. Steffes had made prior to the date of those statements.

138.    Furthermore, Mr. Steffes waited eight days after the Warren Buffett announcement to invest additional funds in FECI.  By this time, any effect of Warren Buffett's news would already be incorporated into the trading price of FECI stock and there would be no obvious opportunities for incremental trading gains as a result of this news.

139.    In fact, Mr. Buffett's statements were not significant to potential purchasers of FECI stock.  The Seams Report concludes that there were statistically significant stock returns on April 9, 2007 for other railroad stocks, but that there were no such statistically significant returns for FECI.[121]  The Seams Report also shows that FECI stock prices were the least reactive of railroad stocks on April 9, 2007.[122]  This indicates that the market as a whole considered other railroad companies to be more likely Buffett acquisition candidates than FECI.

---

[120] Deposition Testimony of Rex C. Steffes, September 19, 2012, 223:1 – 226:10.

[121] Seams Report, pp. 25-26.  As noted in her report, she did not fully control for confounding news in conducting its assessment of excess returns of other railroad stocks.

[122] Seams Report, p. 21.

140.     By his own admission, Mr. Steffes could not recall ever previously following Warren Buffett's investing strategies, and he was also unable to recall any common investments.[123]  If an investor were seriously considering following Warren Buffett, a straightforward option would be to invest in Mr. Buffett's company, Berkshire Hathaway, something Mr. Steffes never did.[124]

141.     Accordingly, the Warren Buffett announcement on April 9 cannot rationally explain the Defendants' investment in FECI prior to that date, and it does not represent a reasonable explanation for the substantial increase in the magnitude and risk of that investment after that date.

### D.     Mr. Steffes' Explanation Equating FECI to a Short Term Investment Like a Bank Deposit Is Not a Reasonable Explanation for the 2007 FECI Investment

142.     In discussing Mr. Buffett's typical investing strategy, Mr. Steffes states that his investment in FECI was "definitely more short term…I was just looking for a vehicle to park some money besides a bank; I wanted to buy a section of farm ground."[125]  No reasonable investor would ever consider an investment in any stock an equivalent to "parking money" in a bank, where deposits are insured, subject to certain limits.  According to the Financial Industrial Regulatory Authority ("FINRA"), every investor should be aware that "[w]ith investments that aren't insured, such as stocks, bonds, and mutual funds, you face the risk that you might lose money, which can happen if the price falls and you sell for less than you paid to buy."[126]  Accordingly, this cannot be a reasonable explanation for the investment made by the Defendants.

---

[123] Deposition Testimony of Rex C. Steffes, October 25, 2012, 441:12 - 442:10.

[124] Deposition Testimony of Rex C. Steffes, October 25, 2012, 435:23 - 436:16.

[125] Deposition Testimony of Rex C. Steffes, October 25, 2012, 450: 4 – 7.

[126] http://www.finra.org/Investors/SmartInvesting/AdvancedInvesting/ManagingInvestmentRisk/

### E.     Investools "Buy" Signals Are Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades

143.    I understand that Mr. Steffes also discusses using an investing software tool called Investools which identifies "buy signals" using a series of moving average calculations, among other things.   Although there are other aspects to Investools which are beyond the scope of this report, Investools is merely an organized way to present a series of moving average calculations based upon stock price and volume.  In essence, Investools tracks and calculates data for investors graphing it in a way that makes it visually easier to comprehend.  However, Investools is not, nor should it be considered, investment advice.  Even if one were to accept the premise that Investools is a highly analytical tool with predictive power regarding stock returns, it is not clear that the Defendants followed its investing recommendations.

144.    In his deposition, Mr. Steffes discusses the three green arrows in Investools for FECI which represent "buy" signals.[127]   The Investools manual identifies three types of indicators:  (1) a 30 day moving average of stock price, (2) the MACD which is a "combination of two moving averages:  a fast one and a slow one and how they interact" and (3) a stochastic measure which identifies stock price movements over the past 14 days outside the 25th and 75th quartiles.[128] When the trends identified by these indicators move in certain directions, they are labeled with green arrows (a "buy" signal) or red arrows (a "sell" signal).

145.    The existence of three green arrows on some of the Defendants' FECI purchase dates does not explain why they purchased when they did and not at other dates when FECI showed

---

[127] Deposition Testimony of Rex C. Steffes, October 25, 2012 516:10 – 520:19.   Rex C. Steffes Deposition Exhibit 19.

[128] Bret Steffes Deposition Exhibit 19, pp. 67, 71, 73 and 74.

three green arrows under the Investools system. Mr. Steffes, Bret Steffes, and Rex R. Steffes all acknowledge that there were periods for FECI in which Investools showed three green arrows but they did not invest in FECI.[129] Further, Rex R. Steffes acknowledges that around May 1 (his final acquisition of FECI options), there was a red arrow.[130]

146.    In describing how he applies this tool to his investing strategy, Mr. Steffes states "[w]hen everything lines up on a stock, you've got all these buy signals from the Standard & Poor's, you've got all the buy signals from Investools, it's time to go to the closet, dust off the Mickey Mantle bat, and get up to that plate, and knock it out of the park."[131] When asked if he was trying to hit a "home run" with his FECI investment, Mr. Steffes states "Yes, I was."[132]

147.    Contrary to Mr. Steffes' assertion, three green arrows in Investools do not explain or justify the magnitude or risk of the investment that he made in FECI. The Investools manual itself states that a characteristic of "Poor Money Management" is "Trying to hit a home run while putting most of your capital into one play."[133] Mr. Steffes ignored this piece of Investools guidance by investing 60% of his liquid net worth on FECI.

148.    I note that Investools also offers the advice in its option investing manual: "Due to the risk associated with leveraged investments, it's wise to limit their use to a small percentage of

---

[129] Deposition Testimony of Rex C. Steffes, December 18, 2012, 755:16 – 756:8. Deposition Testimony of Rex R. Steffes, August 31, 2012, 359:8 – 361:23. Deposition Testimony of Bret Steffes, June 15, 2012, 366:23 – 372:10.

[130] Deposition Testimony of Rex R. Steffes, August 31, 2012, 362:24 – 363:4.

[131] Deposition Testimony of Rex C. Steffes, September 19, 2012, 268:17 - 22.

[132] Deposition Testimony of Rex C. Steffes, September 19, 2012, 269:16 – 19.

[133] Bret Steffes Deposition Exhibit 19, p. 92.

Page 53

your portfolio. Many experts suggest a limit of 5 – 10% for leveraged investments."[134] Bret, Cliff, and Rex R. Steffes invested nearly their entire portfolio in FECI options, well exceeding the threshold set forth by Investools of 5-10%.[135] Despite the investing risks of options identified by Investools, Mr. Steffes stated that he knew he could roll them over, replacing options contracts expiring in June 2007 with options expiring in September 2007.[136] However, rolling over his FECI options would be an expensive way to invest in FECI. Exhibit IV-18 identifies the time value of the options purchased by Mr. Steffes was $54,642. If Mr. Steffes' investment were to be viewed on an annualized basis, Mr. Steffes would need to roll these options every two months. Assuming the stock price remained constant, he would theoretically be investing $327,852 just in the time value of options over this time frame ($54,642 x 6).[137] If he had bought the underlying shares instead of option contracts, his basis in those shares would be $1,549,948.[138] In order to break even on his investment, and assuming he rolled his options, he would have been expecting the equivalent investment return of 21% ($327,852/$1,549,948) just to break even. This rate of return is well in excess of equity returns available at this time.

---

[134] Rex C. Steffes Deposition Exhibit 20, p. 6.

[135] Liquid net worth is measured by including cash, stocks, options and metals at cost. The sons' OptionsXpress and bank statements were used to identify cash and asset holdings as of May 7, 2007. I am unaware of any metals assets. Applying this measure, as outlined earlier in this report that Bret, Cliff and Rex R. Steffes invested 96%, 84% and 93%, respectively, of their liquid net worth in FECI options.

[136] Deposition Testimony of Rex C. Steffes, December 18, 2012, 571:7-15.

[137] I estimate a two months rollover period based on the approximate two months that preceded three of the four options purchases made by Mr. Steffes.

[138] This number is calculated by adding the notional value of each option purchase together. The notional value is calculated by multiplying the number of options contracts purchased by 100 shares per contract by the market price on the date the option contract is purchased. Or, (66 contracts *100 shares per contract *$66.36 market price, or $437,976) + (34 contracts *100 shares per contract *$66.58 market price, or $226,372) + (25 contracts *100 shares per contract *$72.20 market price, or $180,500) + (100 contracts *100 shares per contract *$70.51 market price, or $705,100) = $1,549,948. See also Exhibit IV-18.

S&P 500 returns for year 2007 were approximately 3.65%.[139] Accordingly, purchasing and rolling over would make no sense for the long term in the prevailing equity market conditions.

149. Mr. Steffes also holds a different opinion from Investools regarding the benefits of diversification. In his deposition, Mr. Steffes stated, "I always thought diversification was almost another word for you didn't know what you were doing."[140] Conversely, the Investools manual cites "diversifying your capital across a number of stocks in different industry groups" as one of the hallmarks of "good money management."[141]

150. As a result of all these factors, even if one accepted the premise that Investools represents sophisticated investment guidance, the presence of "buy signals" in Investools is simply not a reasonable or complete explanation for the size and risk of the FECI investments by the Defendants during 2007 relative to the rest of their portfolios or net worth.

### F. Favorable Analyst Reports Are Not a Reasonable Explanation for the Magnitude of Defendants' 2007 FECI Trades

151. Mr. Steffes also cites visiting his broker at Edward Jones and reviewing reports summarizing three "buy" recommendations from analysts.[142] I have reviewed the Edward Jones reports that Mr. Steffes received on February 15, 2007 and on March 28, 2007 and note that between these two dates, there were favorable and unfavorable trends, as well as an FECI earnings announcement.[143] The Edward Jones provide minimal information about the content of

---

[139] Bloomberg.

[140] Deposition Testimony of Rex C. Steffes, September 19, 2012, 267:22-24.

[141] Bret Steffes Deposition Exhibit 19, p. 91.

[142] Deposition Testimony of Rex C. Steffes, October 25, 2012, 447:18-448:1.

[143] See also Robbins Defendants' Deposition Exhibits 18 and 22. Form 8-K for FECI Dated February 15, 2007.

the analyst reports themselves.  On February 15, 2007, the reports provided by Edward Jones identified two buy recommendations and one accumulate recommendation.[144]  By March 28, 2007, one analyst had changed their recommendation, improving it from an accumulate recommendation to a buy recommendation.[145]  This cursory summary would not be a reasonable basis for the size of the Defendants' FECI investments relative to their net worth.

152.    I have considered the full text of the analyst reports available during March and April 2007 including those of Morgan Keegan, Stifel Nicolaus (or Ryan Beck) and Sidoti, among others.[146]  It is unclear whether Mr. Steffes read the full analyst reports or to what extent he may have relied upon them in making his FECI investment decision.[147]  In my experience, most analyst reports are available only by subscription, and are not freely available to the marketplace on the Internet.

153.    The Edward Jones summaries do not explain or justify the size and risk of the FECI investments made by Mr. Steffes beginning in March, 2007.  Further, the change between February and March in these reports does not explain why Mr. Steffes made no investment in FECI in February, and a large and unprecedented investment in FECI beginning in March 2007. A reasonable investor would not have made such a dramatic change in his investment portfolio, investing more than $1 million in FECI, based on such a modest change in the analyst recommendations.

---

[144] Ibid.

[145] Ibid.

[146] See documents considered.  I understand that the analyst covering FECI moved to Stifel Nicolaus from Ryan Beck during this time frame.

[147] Rex C. Steffes Deposition Testimony, September 19, 2012 and October 25, 2012, pp. 209:13-19, 221:3-222:13, 230:9-231:4, 239:4-24, 394:4-397:20.

Submitted By:

Nicholas J. Weir

May 24, 2013

# Rex C. Steffes
## Summary of Investments in FECI in 2007

| Date | Quantity (Notional Shares) | | | | Purchase | Sale |
|------|------|------|------|------|------|------|
| | Stock | | Option | | | |
| | Bought | Sold | Bought | Sold | | |
| 3/28/2007 | 6,500 | | | | $398,859 | |
| 4/2/2007 | 7,800 | | | | $487,234 | |
| 4/17/2007 | | | 6,600 | | $49,297 | |
| 4/18/2007 | | | 3,400 | | $27,481 | |
| 4/23/2007 | | | 2,500 | | $35,287 | |
| 4/27/2007 | 1,500 | | | | $108,775 | |
| 4/30/2007 | | | 10,000 | | $42,525 | |
| 5/8/2007 | | | | 12,500 | | $292,447 |
| 5/8/2007 | | | | 10,000 | | $138,188 |
| 5/8/2007 | | 15,800 | | | | $1,323,414 |
| **Total** | **15,800** | **15,800** | **22,500** | **22,500** | **$1,149,459** | **$1,754,049** |
| **Profit** | | | | | | **$604,590** |

Sources: Rex C. Steffes' tax returns forms from 2002 - 2007; Edward Jones trading records from Jan 2007 to Sep 2008; Charles Schwab trading records from Dec 2005 to Dec 2007; A. G. Edwards trading records (Account 5909-6980) from Aug 2005 to Dec 2007.

Note: Purchase price includes commissions and fees. Gross sales proceeds are reduced by commissions and fees.

Exhibit II - 01



**FECI Stock Price and Volume**
**1/1/2007 - 5/31/2007**

Source - CRSP. Rex C. Steffes' tax return forms from 2002 - 2007; Edward Jones trading record from Jan 2007 to Sep 2008; Charles Schwab trading record from Dec 2005 to Dec 2007; A. G. Edwards trading records (Account 5909-6980) from Aug 2005 to Dec 2007.

**Exhibit II - 02**

### Bret Steffes
### Summary of Investments in FECI in 2007

| | Stock | | Option | | | |
|---|---|---|---|---|---|---|
| Date | Bought | Sold | Bought | Sold | Purchase | Sale |
| 3/29/2007 | 50 | | | | $3,083 | |
| 4/2/2007 | | | 5,000 | | $6,425 | |
| 4/2/2007 | | 20 | | | | $1,243 |
| 4/3/2007 | | 30 | | | | $1,903 |
| 4/19/2007 | | | 1,700 | | $9,546 | |
| 5/1/2007 | | | | 1,700 | | $11,704 |
| 5/1/2007 | | | 1,000 | | $4,215 | |
| 5/1/2007 | | | 3,500 | | $7,928 | |
| 5/8/2007 | | | | 6,000 | | $86,909 |
| 5/8/2007 | | | | 3,500 | | $33,197 |
| **Total** | **50** | **50** | **11,200** | **11,200** | **$31,196** | **$134,955** |
| **Profit** | | | | | | **$103,759** |

Source: OptionsXpress.

Notes:

(1) Purchase price includes commission and fees. Gross sales proceeds are reduced by commissions and fees.

(2) Maximum position is calculated as below

| | Stock Quantity | Option Quantity | | Investments |
|---|---|---|---|---|
| Total Purchased | 50 | 11,200 | | $31,196 |
| Less: Intra-period Stock Sales | (50) | | | ($3,083) |
| Less: Intra-period Option Sales | | (1,700) | | ($9,546) |
| Maximum Positions | | | | $18,568 |

Page 3 of 77

**Exhibit II - 03**

## Cliff Steffes
## Summary of Investments in FECI in 2007

| Date | Quantity (Notional Shares) | | | | Purchase | Sale |
|------|------|------|------|------|------|------|
| | Stock | | Option | | | |
| | Bought | Sold | Bought | Sold | | |
| 4/3/2007 | | | 1,500 | | $2,048 | |
| 4/19/2007 | | | 1,700 | | $9,716 | |
| 5/1/2007 | | | 1,500 | | $3,323 | |
| 5/8/2007 | | | | 1,700 | | $32,274 |
| 5/8/2007 | | | | 1,500 | | $20,977 |
| 5/8/2007 | | | | 1,500 | | $13,627 |
| **Total** | **-** | **-** | **4,700** | **4,700** | **$15,086** | **$66,878** |
| **Profit** | | | | | | **$51,793** |

Source: OptionsXpress.

Note: Purchase price includes commissions and fees. Gross sales proceeds are reduced by commissions and fees.

Exhibit II - 04

## Rex R. Steffes
## Summary of Investments in FECI in 2007

| | Quantity (Notional Shares) | | | | | |
|---|---|---|---|---|---|---|
| | Stock | | Option | | | |
| Date | Bought | Sold | Bought | Sold | Purchase | Sale |
| 3/29/2007 | 60 | | | | $3,700 | |
| 4/2/2007 | | | 5,000 | | $5,400 | |
| 4/2/2007 | | 30 | | | | $1,857 |
| 4/3/2007 | | 10 | | | | $623 |
| 4/19/2007 | | | 1,700 | | $9,716 | |
| 5/1/2007 | | | | 1,700 | | $11,704 |
| 5/1/2007 | | | 1,000 | | $4,215 | |
| 5/1/2007 | | | 3,500 | | $7,928 | |
| 5/1/2007 | | 20 | | | | $1,402 |
| 5/8/2007 | | | | 6,000 | | $87,509 |
| 5/8/2007 | | | | 3,500 | | $33,197 |
| **Total** | **60** | **60** | **11,200** | **11,200** | **$30,958** | **$136,292** |
| **Profit** | | | | | | **$105,334** |

Source: OptionsXpress.

Notes:

(1) Purchase price includes commissions and fees. Gross sales proceeds are reduced by commissions and fees.

(2) Maximum position is calculated as below

| | Stock Quantity | Option Quantity | Investments |
|---|---|---|---|
| Total Purchased | 60 | 11,200 | $30,958 |
| Less: Intra-period Stock Sales | (60) | | ($3,700) |
| Less: Intra-period Option Sales | | (1,700) | ($9,716) |
| Maximum Positions | | | $17,543 |

Page 5 of 77

**Exhibit II - 05**



### Rex C. Steffes
### Size of Investment by Company
### 1/1/2002 - 5/8/2007

Investment in FECI: $1,149,459
Average Investment in Non-FECI Companies: $25,424

Sources: Rex C. Steffes' tax returns from 2002 - 2007; Edward Jones trading records from Jan 2007 to Sep 2008; Charles Schwab trading records from Dec 2005 to Dec 2007; A. G. Edwards trading records (Account 5909-6980) from Aug 2005 to Dec 2007.
Note: Investment is defined as the maximum aggregate amount invested in stocks and options at the end of any trading day in the investment period shown.

Exhibit IV - 01



**Rex C. Steffes**
## Size of Investment by Company
### 2/2/2007 – 5/8/2007

Investment in FECI: $1,149,459
Average Investment in Non-FECI Companies: $10,766

Sources: Rex C. Steffes' tax returns from 2002 - 2007; Edward Jones trading records from Jan 2007 to Sep 2008; Charles Schwab trading records from Dec 2005 to Dec 2007; A. G. Edwards trading records (Account 5909-6980) from Aug 2005 to Dec 2007. Rex C. Steffes deposition Exhibit-33.
Note: Investment is defined as the maximum aggregate amount invested in stocks and options at the end of any trading day in the investment period shown.

Page 7 of 77                                                    **Exhibit IV – 02**